## LEHR *v.* ROBERTSON ET AL.

No. 81–1756.   Argued December 7, 1982—Decided June 27, 1983

*David J. Freeman* argued the cause and filed briefs for appellant.

*Jay L. Samoff* argued the cause for appellees and filed a brief for appellees Robertson et al. *Robert Abrams*, Attorney General, *pro se*, *Peter H. Schiff*, and *Robert J. Schack*, Assistant Attorney General, filed a brief for appellee Attorney General of New York.*

JUSTICE STEVENS delivered the opinion of the Court.

The question presented is whether New York has sufficiently protected an unmarried father's inchoate relationship with a child whom he has never supported and rarely seen in

---

*\*Louise Gruner Gans* and *Stanley A. Bass* filed a brief for Community Action for Legal Services, Inc., et al. as *amici curiae* urging reversal.

*Elinor Hadley Stillman* filed a brief for the National Committee for Adoption, Inc., as *amicus curiae* urging affirmance.

the two years since her birth. The appellant, Jonathan Lehr, claims that the Due Process and Equal Protection Clauses of the Fourteenth Amendment, as interpreted in *Stanley* v. *Illinois*, 405 U. S. 645 (1972), and *Caban* v. *Mohammed*, 441 U. S. 380 (1979), give him an absolute right to notice and an opportunity to be heard before the child may be adopted. We disagree.

Jessica M. was born out of wedlock on November 9, 1976. Her mother, Lorraine Robertson, married Richard Robertson eight months after Jessica's birth.[1] On December 21, 1978, when Jessica was over two years old, the Robertsons filed an adoption petition in the Family Court of Ulster County, New York. The court heard their testimony and received a favorable report from the Ulster County Department of Social Services. On March 7, 1979, the court entered an order of adoption.[2] In this proceeding, appellant contends that the adoption order is invalid because he, Jessica's putative father, was not given advance notice of the adoption proceeding.[3]

The State of New York maintains a "putative father registry."[4] A man who files with that registry demonstrates his

---

[1] Although both Lorraine and Richard Robertson are appellees in this proceeding, for ease of discussion the term "appellee" will hereafter be used to identify Lorraine Robertson.

[2] The order provided for the adoption of appellee's older daughter, Renee, as well as Jessica. Appellant does not challenge the adoption of Renee.

[3] Appellee has never conceded that appellant is Jessica's biological father, but for purposes of analysis in this opinion it will be assumed that he is.

[4] At the time Jessica's adoption order was entered, N. Y. Soc. Serv. Law § 372–c (McKinney Supp. 1982–1983) provided:

"1. The department shall establish a putative father registry which shall record the names and addresses of . . . any person who has filed with the registry before or after the birth of a child out-of-wedlock, a notice of intent to claim paternity of the child . . . .

"2. A person filing a notice of intent to claim paternity of a child . . . shall include therein his current address and shall notify the registry of any

intent to claim paternity of a child born out of wedlock and is therefore entitled to receive notice of any proceeding to adopt that child. Before entering Jessica's adoption order, the Ulster County Family Court had the putative father registry examined. Although appellant claims to be Jessica's natural father, he had not entered his name in the registry.

In addition to the persons whose names are listed on the putative father registry, New York law requires that notice of an adoption proceeding be given to several other classes of possible fathers of children born out of wedlock—those who have been adjudicated to be the father, those who have been identified as the father on the child's birth certificate, those who live openly with the child and the child's mother and who hold themselves out to be the father, those who have been identified as the father by the mother in a sworn written statement, and those who were married to the child's mother before the child was six months old.[5] Appellant admittedly

---

change of address pursuant to procedures prescribed by regulations of the department.

"3. A person who has filed a notice of intent to claim paternity may at any time revoke a notice of intent to claim paternity previously filed therewith and, upon receipt of such notification by the registry, the revoked notice of intent to claim paternity shall be deemed a nullity nunc pro tunc.

"4. An unrevoked notice of intent to claim paternity of a child may be introduced in evidence by any party, other than the person who filed such notice, in any proceeding in which such fact may be relevant.

"5. The department shall, upon request, provide the names and addresses of persons listed with the registry to any court or authorized agency, and such information shall not be divulged to any other person, except upon order of a court for good cause shown."

[5] At the time Jessica's adoption order was entered, N. Y. Dom. Rel. Law §§ 111-a (2) and (3) (McKinney 1977 and Supp. 1982–1983) provided:

"2. Persons entitled to notice, pursuant to subdivision one of this section, shall include:

"(a) any person adjudicated by a court in this state to be the father of the child;

"(b) any person adjudicated by a court of another state or territory of the United States to be the father of the child, when a certified copy of the

was not a member of any of those classes. He had lived with appellee prior to Jessica's birth and visited her in the hospital when Jessica was born, but his name does not appear on Jessica's birth certificate. He did not live with appellee or Jessica after Jessica's birth, he has never provided them with any financial support, and he has never offered to marry appellee. Nevertheless, he contends that the following special circumstances gave him a constitutional right to notice and a hearing before Jessica was adopted.

On January 30, 1979, one month after the adoption proceeding was commenced in Ulster County, appellant filed a "visitation and paternity petition" in the Westchester County Family Court. In that petition, he asked for a determination of paternity, an order of support, and reasonable visitation privileges with Jessica. Notice of that proceeding was served on appellee on February 22, 1979. Four days later appellee's attorney informed the Ulster County Court that appellant had commenced a paternity proceeding in Westchester County; the Ulster County judge then entered an

---

court order has been filed with the putative father registry, pursuant to section three hundred seventy-two-c of the social services law;

"(c) any person who has timely filed an unrevoked notice of intent to claim paternity of the child, pursuant to section three hundred seventy-two of the social services law;

"(d) any person who is recorded on the child's birth certificate as the child's father;

"(e) any person who is openly living with the child and the child's mother at the time the proceeding is initiated and who is holding himself out to be the child's father;

"(f) any person who has been identified as the child's father by the mother in written, sworn statement; and

"(g) any person who was married to the child's mother within six months subsequent to the birth of the child and prior to the execution of a surrender instrument or the initiation of a proceeding pursuant to section three hundred eighty-four-b of the social services law.

"3. The sole purpose of notice under this section shall be to enable the person served pursuant to subdivision two to present evidence to the court relevant to the best interests of the child."

order staying appellant's paternity proceeding until he could rule on a motion to change the venue of that proceeding to Ulster County. On March 3, 1979, appellant received notice of the change of venue motion and, for the first time, learned that an adoption proceeding was pending in Ulster County.

On March 7, 1979, appellant's attorney telephoned the Ulster County judge to inform him that he planned to seek a stay of the adoption proceeding pending the determination of the paternity petition. In that telephone conversation, the judge advised the lawyer that he had already signed the adoption order earlier that day. According to appellant's attorney, the judge stated that he was aware of the pending paternity petition but did not believe he was required to give notice to appellant prior to the entry of the order of adoption.

Thereafter, the Family Court in Westchester County granted appellee's motion to dismiss the paternity petition, holding that the putative father's right to seek paternity "must be deemed severed so long as an order of adoption exists." App. 228. Appellant did not appeal from that dismissal.[6] On June 22, 1979, appellant filed a petition to vacate the order of adoption on the ground that it was obtained by fraud and in violation of his constitutional rights. The Ulster County Family Court received written and oral argument on the question whether it had "dropped the ball" by approving the adoption without giving appellant advance notice. Tr. 53. After deliberating for several months, it denied the petition, explaining its decision in a thorough written opinion. In re Adoption of Martz, 102 Misc. 2d 102, 423 N. Y. S. 2d 378 (1979).

The Appellate Division of the Supreme Court affirmed. In re Adoption of Jessica "XX," 77 App. Div. 2d 381, 434 N. Y. S. 2d 772 (1980). The majority held that appellant's commencement of a paternity action did not give him any

---

[6] Without trying to intervene in the adoption proceeding, appellant had attempted to file an appeal from the adoption order. That appeal was dismissed.

right to receive notice of the adoption proceeding, that the notice provisions of the statute were constitutional, and that *Caban* v. *Mohammed*, 441 U. S. 380 (1979), was not retroactive.[7]  Parenthetically, the majority observed that appellant "could have insured his right to notice by signing the putative father registry."  77 App. Div. 2d, at 383, 434 N. Y. S. 2d, at 774.  One justice dissented on the ground that the filing of the paternity proceeding should have been viewed as the statutory equivalent of filing a notice of intent to claim paternity with the putative father registry.

The New York Court of Appeals also affirmed by a divided vote.  *In re Adoption of Jessica "XX,"* 54 N. Y. 2d 417, 430 N. E. 2d 896 (1981).  The majority first held that it did not need to consider whether our decision in *Caban* affected appellant's claim that he had a right to notice, because *Caban* was not retroactive.[8]  It then rejected the argument that the mother had been guilty of a fraud upon the court.  Finally, it addressed what it described as the only contention of substance advanced by appellant: that it was an abuse of discretion to enter the adoption order without requiring that notice be given to appellant.  The court observed that the primary purpose of the notice provision of § 111–a was to enable the person served to provide the court with evidence concerning the best interest of the child, and that appellant had made no tender indicating any ability to provide any particular or special information relevant to Jessica's best interest.  Considering the record as a whole, and acknowledging that it might have been prudent to give notice, the court concluded

---

[7] *Caban* was decided on April 24, 1979, about two months after the entry of the order of adoption.  In *Caban*, a father who had lived with his two illegitimate children and their mother for several years successfully challenged the constitutionality of the New York statute providing that children could be adopted without the father's consent even though the mother's consent was required.

[8] Although the dissenters in *Caban* discussed the question of retroactivity, see 441 U. S., at 401, 415–416, that question was not addressed in the Court's opinion.

that the Family Court had not abused its discretion either when it entered the order without notice or when it denied appellant's petition to reopen the proceedings. The dissenting judges concluded that the Family Court had abused its discretion, both when it entered the order without notice and when it refused to reopen the proceedings.

Appellant has now invoked our appellate jurisdiction.[9] He offers two alternative grounds for holding the New York statutory scheme unconstitutional. First, he contends that a putative father's actual or potential relationship with a child born out of wedlock is an interest in liberty which may not be destroyed without due process of law; he argues therefore that he had a constitutional right to prior notice and an opportunity to be heard before he was deprived of that interest. Second, he contends that the gender-based classification in the statute, which both denied him the right to consent to Jessica's adoption and accorded him fewer procedural rights than her mother, violated the Equal Protection Clause.[10]

---

[9] We postponed consideration of our jurisdiction until after hearing argument on the merits. 456 U. S. 970 (1982). Our review of the record persuades us that appellant did in fact draw into question the validity of the New York statutory scheme on the ground of its being repugnant to the Federal Constitution, that the New York Court of Appeals upheld that scheme, and that we therefore have jurisdiction pursuant to 28 U. S. C. § 1257(2).

[10] The question whether the Family Court abused its discretion in not requiring notice to appellant before the adoption order was entered and in not reopening the proceeding is, of course, not before us. That issue was presented to and decided by the New York courts purely as a matter of state law. Whether we might have given such notice had we been sitting as the trial court, or whether we might have considered the failure to give such notice an abuse of discretion had we been sitting as state appellate judges, are questions on which we are not authorized to express an opinion. The only question we have jurisdiction to decide is whether the New York statutes are unconstitutional because they inadequately protect the natural relationship between parent and child or because they draw an impermissible distinction between the rights of the mother and the rights of the father.

*The Due Process Claim.*

The Fourteenth Amendment provides that no State shall deprive any person of life, liberty, or property without due process of law. When that Clause is invoked in a novel context, it is our practice to begin the inquiry with a determination of the precise nature of the private interest that is threatened by the State. See, *e. g.*, *Cafeteria Workers* v. *McElroy*, 367 U. S. 886, 895–896 (1961). Only after that interest has been identified, can we properly evaluate the adequacy of the State's process. See *Morrissey* v. *Brewer*, 408 U. S. 471, 482–483 (1972). We therefore first consider the nature of the interest in liberty for which appellant claims constitutional protection and then turn to a discussion of the adequacy of the procedure that New York has provided for its protection.

I

The intangible fibers that connect parent and child have infinite variety. They are woven throughout the fabric of our society, providing it with strength, beauty, and flexibility. It is self-evident that they are sufficiently vital to merit constitutional protection in appropriate cases. In deciding whether this is such a case, however, we must consider the broad framework that has traditionally been used to resolve the legal problems arising from the parent-child relationship.

In the vast majority of cases, state law determines the final outcome. Cf. *United States* v. *Yazell*, 382 U. S. 341, 351–353 (1966). Rules governing the inheritance of property, adoption, and child custody are generally specified in statutory enactments that vary from State to State.[11] Moreover, equally varied state laws governing marriage and divorce affect a multitude of parent-child relationships. The institu-

---

[11] At present, state legislatures appear inclined to retain the unique attributes of their respective bodies of family law. For example, as of the end of 1982, only eight States had adopted the Uniform Parentage Act. 9A U. L. A. 171 (Supp. 1983).

tion of marriage has played a critical role both in defining the legal entitlements of family members and in developing the decentralized structure of our democratic society.[12] In recognition of that role, and as part of their general overarching concern for serving the best interests of children, state laws almost universally express an appropriate preference for the formal family.[13]

In some cases, however, this Court has held that the Federal Constitution supersedes state law and provides even greater protection for certain formal family relationships. In those cases, as in the state cases, the Court has emphasized the paramount interest in the welfare of children and has noted that the rights of the parents are a counterpart of the responsibilities they have assumed. Thus, the "liberty" of parents to control the education of their children that was vindicated in *Meyer* v. *Nebraska*, 262 U. S. 390 (1923), and *Pierce* v. *Society of Sisters*, 268 U. S. 510 (1925), was described as a "right, coupled with the high duty, to recognize and prepare [the child] for additional obligations." *Id.*, at 535. The linkage between parental duty and parental right was stressed again in *Prince* v. *Massachusetts*, 321 U. S. 158, 166 (1944), when the Court declared it a cardinal principle "that the custody, care and nurture of the child reside

---

[12] See Hafen, Marriage, Kinship, and Sexual Privacy, 81 Mich. L. Rev. 463, 479–481 (1983).

[13] See *Trimble* v. *Gordon*, 430 U. S. 762, 769 (1977) ("No one disputes the appropriateness of Illinois' concern with the family unit, perhaps the most fundamental social institution of our society"). A plurality of the Court noted the societal value of family bonds in *Moore* v. *City of East Cleveland*, 431 U. S. 494, 505 (1977) (opinion of POWELL, J.):

"Out of choice, necessity, or a sense of family responsibility, it has been common for close relatives to draw together and participate in the duties and the satisfactions of a common home. . . . Especially in times of adversity, such as the death of a spouse or economic need, the broader family has tended to come together for mutual sustenance and to maintain or rebuild a secure home life."

first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Ibid.* In these cases the Court has found that the relationship of love and duty in a recognized family unit is an interest in liberty entitled to constitutional protection. See also *Moore* v. *City of East Cleveland*, 431 U. S. 494 (1977) (plurality opinion). "[S]tate intervention to terminate [such a] relationship . . . must be accomplished by procedures meeting the requisites of the Due Process Clause." *Santosky* v. *Kramer*, 455 U. S. 745, 753 (1982).

There are also a few cases in which this Court has considered the extent to which the Constitution affords protection to the relationship between natural parents and children born out of wedlock. In some we have been concerned with the rights of the children, see, *e. g.*, *Trimble* v. *Gordon*, 430 U. S. 762 (1977); *Jimenez* v. *Weinberger*, 417 U. S. 628 (1974); *Weber* v. *Aetna Casualty & Surety Co.*, 406 U. S. 164 (1972). In this case, however, it is a parent who claims that the State has improperly deprived him of a protected interest in liberty. This Court has examined the extent to which a natural father's biological relationship with his child receives protection under the Due Process Clause in precisely three cases: *Stanley* v. *Illinois*, 405 U. S. 645 (1972), *Quilloin* v. *Walcott*, 434 U. S. 246 (1978), and *Caban* v. *Mohammed*, 441 U. S. 380 (1979).

*Stanley* involved the constitutionality of an Illinois statute that conclusively presumed every father of a child born out of wedlock to be an unfit person to have custody of his children. The father in that case had lived with his children all their lives and had lived with their mother for 18 years. There was nothing in the record to indicate that Stanley had been a neglectful father who had not cared for his children. 405 U. S., at 655. Under the statute, however, the nature of the actual relationship between parent and child was completely irrelevant. Once the mother died, the children were automatically made wards of the State. Relying in part on a

Michigan case [14] recognizing that the preservation of "a subsisting relationship with the child's father" may better serve the child's best interest than "uprooting him from the family which he knew from birth," *id.*, at 654–655, n. 7, the Court held that the Due Process Clause was violated by the automatic destruction of the custodial relationship without giving the father any opportunity to present evidence regarding his fitness as a parent.[15]

*Quilloin* involved the constitutionality of a Georgia statute that authorized the adoption, over the objection of the natural father, of a child born out of wedlock. The father in that case had never legitimated the child. It was only after the mother had remarried and her new husband had filed an adoption petition that the natural father sought visitation rights and filed a petition for legitimation. The trial court found adoption by the new husband to be in the child's best interests, and we unanimously held that action to be consistent with the Due Process Clause.

*Caban* involved the conflicting claims of two natural parents who had maintained joint custody of their children from the time of their birth until they were respectively two and four years old. The father challenged the validity of an order authorizing the mother's new husband to adopt the children; he relied on both the Equal Protection Clause and the Due Process Clause. Because this Court upheld his equal protection claim, the majority did not address his due process challenge. The comments on the latter claim by the four dissenting Justices are nevertheless instructive, because they identify the clear distinction between a mere biolog-

---

[14] *In re Mark T.*, 8 Mich. App. 122, 154 N. W. 2d 27 (1967).

[15] Having "concluded that all Illinois parents are constitutionally entitled to a hearing on their fitness before their children are removed from their custody," the Court also held "that denying such a hearing to Stanley and those like him while granting it to other Illinois parents is inescapably contrary to the Equal Protection Clause." 405 U. S., at 658.

ical relationship and an actual relationship of parental responsibility.

Justice Stewart correctly observed:

> "Even if it be assumed that each married parent after divorce has some substantive due process right to maintain his or her parental relationship, cf. *Smith* v. *Organization of Foster Families*, 431 U. S. 816, 862–863 (opinion concurring in judgment), it by no means follows that each unwed parent has any such right. *Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring.*" 441 U. S., at 397 (emphasis added).[16]

In a similar vein, the other three dissenters in *Caban* were prepared to "assume that, *if and when one develops*, the relationship between a father and his natural child is entitled to protection against arbitrary state action as a matter of due process." *Caban* v. *Mohammed, supra,* at 414 (emphasis added).

---

[16] In the balance of that paragraph Justice Stewart noted that the relation between a father and his natural child may acquire constitutional protection if the father enters into a traditional marriage with the mother or if "the actual relationship between father and child" is sufficient.

"The mother carries and bears the child, and in this sense her parental relationship is clear. The validity of the father's parental claims must be gauged by other measures. By tradition, the primary measure has been the legitimate familial relationship he creates with the child by marriage with the mother. By definition, the question before us can arise only when no such marriage has taken place. In some circumstances the actual relationship between father and child may suffice to create in the unwed father parental interests comparable to those of the married father. Cf. *Stanley* v. *Illinois, supra.* But here we are concerned with the rights the unwed father may have when his wishes and those of the mother are in conflict, and the child's best interests are served by a resolution in favor of the mother. It seems to me that the absence of a legal tie with the mother may in such circumstances appropriately place a limit on whatever substantive constitutional claims might otherwise exist by virtue of the father's actual relationship with the children." 441 U. S., at 397.

The difference between the developed parent-child relationship that was implicated in *Stanley* and *Caban*, and the potential relationship involved in *Quilloin* and this case, is both clear and significant. When an unwed father demonstrates a full commitment to the responsibilities of parenthood by "com[ing] forward to participate in the rearing of his child," *Caban*, 441 U. S., at 392, his interest in personal contact with his child acquires substantial protection under the Due Process Clause. At that point it may be said that he "act[s] as a father toward his children." *Id.*, at 389, n. 7. But the mere existence of a biological link does not merit equivalent constitutional protection. The actions of judges neither create nor sever genetic bonds. "[T]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in 'promot[ing] a way of life' through the instruction of children . . . as well as from the fact of blood relationship." *Smith* v. *Organization of Foster Families for Equality and Reform*, 431 U. S. 816, 844 (1977) (quoting *Wisconsin* v. *Yoder*, 406 U. S. 205, 231–233 (1972)).[17]

---

[17] Commentators have emphasized the constitutional importance of the distinction between an inchoate and a fully developed relationship. See Comment, 46 Brooklyn L. Rev. 95, 115–116 (1979) ("the unwed father's interest springs not from his biological tie with his illegitimate child, but rather, from the relationship he has established with and the responsibility he has shouldered for his child"); Note, 58 Neb. L. Rev. 610, 617 (1979) ("a putative father's failure to show a substantial interest in his child's welfare and to employ methods provided by state law for solidifying his parental rights . . . will remove from him the full constitutional protection afforded the parental rights of other classes of parents"); Note, 29 Emory L. J. 833, 854 (1980) ("an unwed father's rights in his child do not spring solely from the biological fact of his parentage, but rather from his willingness to admit his paternity and express some tangible interest in the child"). See also Poulin, Illegitimacy and Family Privacy: A Note on Maternal Cooperation in Paternity Suits, 70 Nw. U. L. Rev. 910, 916–919 (1976) (hereinafter Poulin); Developments in the Law, 93 Harv. L. Rev. 1156, 1275–1277 (1980); Note, 18 Duquesne L. Rev. 375, 383–384, n. 73 (1980); Note, 19 J. Family L. 440, 460 (1980); Note, 57 Denver L. J. 671, 680–683 (1980);

The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development.[18] If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie.

In this case, we are not assessing the constitutional adequacy of New York's procedures for terminating a developed relationship. Appellant has never had any significant custodial, personal, or financial relationship with Jessica, and he did not seek to establish a legal tie until after she was two years old.[19] We are concerned only with whether New York

---

Note, 1979 Wash. U. L. Q. 1029, 1035; Note, 12 U. C. D. L. Rev. 412, 450, n. 218 (1979).

[18] Of course, we need not take sides in the ongoing debate among family psychologists over the relative weight to be accorded biological ties and psychological ties, in order to recognize that a natural father who has played a substantial role in rearing his child has a greater claim to constitutional protection than a mere biological parent. New York's statutory scheme reflects these differences, guaranteeing notice to any putative father who is living openly with the child, and providing putative fathers who have never developed a relationship with the child the opportunity to receive notice simply by mailing a postcard to the putative father registry.

[19] This case happens to involve an adoption by the husband of the natural mother, but we do not believe the natural father has any greater right to object to such an adoption than to an adoption by two total strangers. If anything, the balance of equities tips the opposite way in a case such as this. In denying the putative father relief in *Quilloin* v. *Walcott*, 434 U. S. 246 (1978), we made an observation equally applicable here:

"Nor is this a case in which the proposed adoption would place the child with a new set of parents with whom the child had never before lived. Rather, the result of the adoption in this case is to give full recognition to a family unit already in existence, a result desired by all concerned, except appellant. Whatever might be required in other situations, we cannot say that the State was required in this situation to find anything more than

has adequately protected his opportunity to form such a relationship.

## II

· The most effective protection of the putative father's opportunity to develop a relationship with his child is provided by the laws that authorize formal marriage and govern its consequences. But the availability of that protection is, of course, dependent on the will of both parents of the child. Thus, New York has adopted a special statutory scheme to protect the unmarried father's interest in assuming a responsible role in the future of his child.

After this Court's decision in *Stanley*, the New York Legislature appointed a special commission to recommend legislation that would accommodate both the interests of biological fathers in their children and the children's interest in prompt and certain adoption procedures. The commission recommended, and the legislature enacted, a statutory adoption scheme that automatically provides notice to seven categories of putative fathers who are likely to have assumed some responsibility for the care of their natural children.[20] If

---

that the adoption, and denial of legitimation, were in the 'best interests of the child.'" *Id.*, at 255.

[20] In a report explaining the purpose of the 1976 amendments to § 111–a of the New York Domestic Relations Law, the temporary state commission on child welfare that was responsible for drafting the legislation stated, in part:

"The measure will dispel uncertainties by providing clear constitutional statutory guidelines for notice to fathers of out-of-wedlock children. It will establish a desired finality in adoption proceedings and will provide an expeditious method for child placement agencies of identifying those fathers who are entitled to notice through the creation of a registry of such fathers within the State Department of Social Services. Conversely, the bill will afford to concerned fathers of out-of-wedlock children a simple means of expressing their interest and protecting their rights to be notified and have an opportunity to be heard. It will also obviate an existing disparity of Appellate Division decisions by permitting such fathers to be petitioners in paternity proceedings.

"The measure is intended to codify the minimum protections for the putative father which *Stanley* would require. In so doing it reflects policy

this scheme were likely to omit many responsible fathers, and if qualification for notice were beyond the control of an interested putative father, it might be thought procedurally inadequate. Yet, as all of the New York courts that reviewed this matter observed, the right to receive notice was completely within appellant's control. By mailing a postcard to the putative father registry, he could have guaranteed that he would receive notice of any proceedings to adopt Jessica. The possibility that he may have failed to do so because of his ignorance of the law cannot be a sufficient reason for criticizing the law itself. The New York Legislature concluded that a more open-ended notice requirement would merely complicate the adoption process, threaten the privacy interests of unwed mothers,[21] create the risk of unnecessary controversy, and impair the desired finality of adoption decrees. Regardless of whether we would have done likewise if we were legislators instead of judges, we surely cannot characterize the State's conclusion as arbitrary.[22]

Appellant argues, however, that even if the putative father's opportunity to establish a relationship with an illegitimate child is adequately protected by the New York statutory scheme in the normal case, he was nevertheless entitled

---

decisions to (a) codify constitutional requirements; (b) clearly establish, as early as possible in a child's life, the rights, interests and obligations of all parties; (c) facilitate prompt planning for the future of the child and permanence of his status; and (d) through the foregoing, promote the best interest of children." App. to Brief for Appellant C–15.

[21] Cf. *Roe* v. *Norton*, 422 U. S. 391 (1975), vacating and remanding 365 F. Supp. 65 (Conn. 1973). See Poulin 922–932; Barron, Notice to the Unwed Father and Termination of Parental Rights, 9 Family L. Q. 527, 542 (1975).

[22] Nor can we deem unconstitutionally arbitrary the state courts' conclusion that appellant's absence did not distort their analysis of Jessica's best interests. The adoption does not affect Jessica's relationship with her mother. It gives legal permanence to her relationship with her adoptive father, a relationship they had maintained for 21 months at the time the adoption order was entered. Appellant did not proffer any evidence to suggest that legal confirmation of the established relationship would be unwise; he did not even know the adoptive father.

to special notice because the court and the mother knew that he had filed an affiliation proceeding in another court.   This argument amounts to nothing more than an indirect attack on the notice provisions of the New York statute.   The legitimate state interests in facilitating the adoption of young children and having the adoption proceeding completed expeditiously that underlie the entire statutory scheme also justify a trial judge's determination to require all interested parties to adhere precisely to the procedural requirements of the statute.   The Constitution does not require either a trial judge or a litigant to give special notice to nonparties who are presumptively capable of asserting and protecting their own rights.[23]   Since the New York statutes adequately protected appellant's inchoate interest in establishing a relationship with Jessica, we find no merit in the claim that his constitutional rights were offended because the Family Court strictly complied with the notice provisions of the statute.

*The Equal Protection Claim.*

The concept of equal justice under law requires the State to govern impartially.   *New York City Transit Authority* v. *Beazer*, 440 U. S. 568, 587 (1979).   The sovereign may not draw distinctions between individuals based solely on differences that are irrelevant to a legitimate governmental objective.   *Reed* v. *Reed*, 404 U. S. 71, 76 (1971).[24]   Specifically,

---

[23] It is a generally accepted feature of our adversary system that a potential defendant who knows that the statute of limitations is about to run has no duty to give the plaintiff advice.   There is no suggestion in the record that appellee engaged in fraudulent practices that led appellant not to protect his rights.

[24] In *Reed,* the Court considered an Idaho statute providing that in designating administrators of the estates of intestate decedents, "[o]f several persons claiming and equally entitled to administer, males must be preferred to females."   See 404 U. S., at 73.   The State had sought to justify the statute as a way to reduce the workload of probate courts by eliminating one class of contests.   Writing for a unanimous Court, THE CHIEF JUSTICE observed that in using gender to promote that objective, the legisla-

266

it may not subject men and women to disparate treatment when there is no substantial relation between the disparity and an important state purpose. *Ibid.; Craig* v. *Boren*, 429 U. S. 190, 197–199 (1976).

The legislation at issue in this case, N. Y. Dom. Rel. Law §§ 111 and 111–a (McKinney 1977 and Supp. 1982–1983), is intended to establish procedures for adoptions. Those procedures are designed to promote the best interests of the child, to protect the rights of interested third parties, and to ensure promptness and finality.[25] To serve those ends, the legislation guarantees to certain people the right to veto an adoption and the right to prior notice of any adoption proceeding. The mother of an illegitimate child is always within that favored class, but only certain putative fathers are included. Appellant contends that the gender-based distinction is invidious.

As we have already explained, the existence or nonexistence of a substantial relationship between parent and child is a relevant criterion in evaluating both the rights of the

---

ture had made "the very kind of arbitrary legislative choice forbidden by the Equal Protection Clause." *Id.*, at 76. The State's articulated goal could have been completely served by requiring a coin flip. The decision instead to choose a rule that systematically harmed women could be explained only as the product of habit, rather than analysis or reflection, cf. *Califano* v. *Goldfarb*, 430 U. S. 199, 222 (1977) (STEVENS, J., concurring in judgment), or as the product of an invidious and indefensible stereotype, cf. *id.*, at 218. Such legislative decisions are inimical to the norm of impartial government.

The mandate of impartiality also constrains those state actors who implement state laws. Thus, the Equal Protection Clause would have been violated in precisely the same manner if in *Reed* there had been no statute and the probate judge had simply announced that he chose Cecil Reed over Sally Reed "because I prefer males to females."

[25] Appellant does not contest the vital importance of those ends to the people of New York. It has long been accepted that illegitimate children whose parents never marry are "at risk" economically, medically, emotionally, and educationally. See E. Crellin, M. Pringle, & P. West, Born Illegitimate: Social and Educational Implications 96–112 (1971); cf. T. Lash, H. Sigal, & D. Dudzinski, State of the Child: New York City II, p. 47 (1980).

parent and the best interests of the child. In *Quilloin* v. *Walcott*, we noted that the putative father, like appellant, "ha[d] never shouldered any significant responsibility with respect to the daily supervision, education, protection, or care of the child. Appellant does not complain of his exemption from these responsibilities . . . ." 434 U. S., at 256. We therefore found that a Georgia statute that always required a mother's consent to the adoption of a child born out of wedlock, but required the father's consent only if he had legitimated the child, did not violate the Equal Protection Clause. Because appellant, like the father in *Quilloin*, has never established a substantial relationship with his daughter, see *supra*, at 262, the New York statutes at issue in this case did not operate to deny appellant equal protection.

We have held that these statutes may not constitutionally be applied in that class of cases where the mother and father are in fact similarly situated with regard to their relationship with the child. In *Caban* v. *Mohammed*, 441 U. S. 380 (1979), the Court held that it violated the Equal Protection Clause to grant the mother a veto over the adoption of a 4-year-old girl and a 6-year-old boy, but not to grant a veto to their father, who had admitted paternity and had participated in the rearing of the children. The Court made it clear, however, that if the father had not "come forward to participate in the rearing of his child, nothing in the Equal Protection Clause [would] preclud[e] the State from withholding from him the privilege of vetoing the adoption of that child." *Id.*, at 392.

Jessica's parents are not like the parents involved in *Caban*. Whereas appellee had a continuous custodial responsibility for Jessica, appellant never established any custodial, personal, or financial relationship with her. If one parent has an established custodial relationship with the child and the other parent has either abandoned[26] or never estab-

---

[26] In *Caban*, the Court noted that an adoption "may proceed in the absence of consent when the parent whose consent otherwise would be required . . . has abandoned the child." 441 U. S., at 392.

lished a relationship, the Equal Protection Clause does not prevent a State from according the two parents different legal rights.[27]

The judgment of the New York Court of Appeals is

*Affirmed.*

JUSTICE WHITE, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, dissenting.

The question in this case is whether the State may, consistent with the Due Process Clause, deny notice and an opportunity to be heard in an adoption proceeding to a putative father when the State has actual notice of his existence, whereabouts, and interest in the child.

## I

It is axiomatic that "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews* v. *Eldridge,* 424 U. S. 319, 333 (1976), quoting *Armstrong* v. *Manzo,* 380 U. S. 545, 552 (1965). As Jessica's biological father, Lehr either had an interest protected by the Constitution or he did not.[1] If the entry of the adoption order in this case deprived Lehr of a constitutionally protected interest, he is entitled to notice and an opportunity to be heard before the order can be accorded finality.

According to Lehr, he and Jessica's mother met in 1971 and began living together in 1974. The couple cohabited for

---

[27] Appellant also makes an equal protection argument based upon the manner in which the statute distinguishes among classes of fathers. For the reasons set forth in our due process discussion, *supra,* we conclude that the statutory distinction is rational and that appellant's argument is without merit.

[1] The majority correctly assumes that Lehr is in fact Jessica's father. Indeed, Lehr has admitted paternity and sought to establish a legal relationship with the child. It is also noteworthy that the mother has never denied that Lehr is the father.

approximately two years, until Jessica's birth in 1976. Throughout the pregnancy and after the birth, Lorraine acknowledged to friends and relatives that Lehr was Jessica's father; Lorraine told Lehr that she had reported to the New York State Department of Social Services that he was the father.[2] Lehr visited Lorraine and Jessica in the hospital every day during Lorraine's confinement. According to Lehr, from the time Lorraine was discharged from the hospital until August 1978, she concealed her whereabouts from him. During this time Lehr never ceased his efforts to locate Lorraine and Jessica and achieved sporadic success until August 1977, after which time he was unable to locate them at all. On those occasions when he did determine Lorraine's location, he visited with her and her children to the extent she was willing to permit it. When Lehr, with the aid of a detective agency, located Lorraine and Jessica in August 1978, Lorraine was already married to Mr. Robertson. Lehr asserts that at this time he offered to provide financial assistance and to set up a trust fund for Jessica, but that Lorraine refused. Lorraine threatened Lehr with arrest unless he stayed away and refused to permit him to see Jessica. Thereafter Lehr retained counsel who wrote to Lorraine in early December 1978, requesting that she permit Lehr to visit Jessica and threatening legal action on Lehr's behalf. On December 21, 1978, perhaps as a response to Lehr's threatened legal action, appellees commenced the adoption action at issue here.

The majority posits that "[t]he intangible fibers that connect parent and child . . . are sufficiently vital to merit constitutional protection *in appropriate cases*." *Ante*, at 256

---

[2] Under 18 NYCRR § 369.2(b) (1982), recipients of public assistance in the Aid to Families with Dependent Children program are required as a condition of eligibility to provide the name and address of the child's father. Lorraine apparently received public assistance after Jessica's birth; it is unclear whether she received public assistance after that regulation went into effect in 1977.

(emphasis added). It then purports to analyze the particular facts of this case to determine whether appellant has a constitutionally protected liberty interest. We have expressly rejected that approach. In *Board of Regents* v. *Roth*, 408 U. S. 564, 570–571 (1972), we stated that although "a weighing process has long been a part of any determination of the *form* of hearing required in particular situations . . . to determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the *nature* of the interest at stake . . . to see if the interest is within the Fourteenth Amendment's protection . . . ." See, *e. g.*, *Smith* v. *Organization of Foster Families*, 431 U. S. 816, 839–842 (1977); *Ingraham* v. *Wright*, 430 U. S. 651, 672 (1977); *Meachum* v. *Fano*, 427 U. S. 215, 224 (1976); *Goss* v. *Lopez*, 419 U. S. 565, 575–576 (1975); *Morrissey* v. *Brewer*, 408 U. S. 471, 481 (1972).

The "nature of the interest" at stake here is the interest that a natural parent has in his or her child, one that has long been recognized and accorded constitutional protection. We have frequently "stressed the importance of familial bonds, whether or not legitimized by marriage, and accorded them constitutional protection." *Little* v. *Streater*, 452 U. S. 1, 13 (1981). If "both the child and the [putative father] in a paternity action have a compelling interest" in the accurate outcome of such a case, *ibid.*, it cannot be disputed that both the child and the putative father have a compelling interest in the outcome of a proceeding that may result in the termination of the father-child relationship. "A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is . . . a commanding one." *Lassiter* v. *Department of Social Services*, 452 U. S. 18, 27 (1981). It is beyond dispute that a formal order of adoption, no less than a formal termination proceeding, operates to permanently terminate parental rights.

Lehr's version of the "facts" paints a far different picture than that portrayed by the majority. The majority's recita-

tion, that "[a]ppellant has never had any significant custodial, personal, or financial relationship with Jessica, and he did not seek to establish a legal tie until after she was two years old," *ante,* at 262, obviously does not tell the whole story. Appellant has never been afforded an opportunity to present his case. The legitimation proceeding he instituted was first stayed, and then dismissed, on appellees' motions. Nor could appellant establish his interest during the adoption proceedings, for it is the failure to provide Lehr notice and an opportunity to be heard there that is at issue here. We cannot fairly make a judgment based on the quality or substance of a relationship without a complete and developed factual record. This case requires us to assume that Lehr's allegations are true—that but for the actions of the child's mother there would have been the kind of significant relationship that the majority concedes is entitled to the full panoply of procedural due process protections.[3]

I reject the peculiar notion that the only significance of the biological connection between father and child is that "it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring." *Ante,* at 262. A "mere biological relationship" is not as unimportant in determining the nature of liberty interests as the majority suggests.

---

[3] In response to our decision in *Caban* v. *Mohammed,* 441 U. S. 380 (1979), the statute governing the persons whose consent is necessary to an adoption has been amended to include certain unwed fathers. The State has recognized that an unwed father's failure to maintain an actual relationship or to communicate with a child will not deprive him of his right to consent if he was "prevented from doing so by the person or authorized agency having lawful custody of the child." N. Y. Dom. Rel. Law § 111(1)(d) (McKinney Supp. 1982–1983) (as amended by Ch. 575, 1980 N. Y. Laws). Thus, even the State recognizes that before a lesser standard can be applied consistent with due process requirements, there must be a determination that there was no significant relationship and that the father was not prevented from forming such a relationship.

"[T]he usual understanding of 'family' implies biological relationships, and most decisions treating the relation between parent and child have stressed this element." *Smith* v. *Organization of Foster Families, supra*, at 843. The "biological connection" is itself a relationship that creates a protected interest. Thus the "nature" of the interest is the parent-child relationship; how well developed that relationship has become goes to its "weight," not its "nature."[4] Whether Lehr's interest is entitled to constitutional protection does not entail a searching inquiry into the quality of the relationship but a simple determination of the *fact* that the relationship exists—a fact that even the majority agrees must be assumed to be established.

Beyond that, however, because there is no established factual basis on which to proceed, it is quite untenable to conclude that a putative father's interest in his child is lacking in substance, that the father in effect has abandoned the child, or ultimately that the father's interest is not entitled to the same minimum procedural protections as the interests of other putative fathers. Any analysis of the adequacy of the notice in this case must be conducted on the assumption that the interest involved here is as strong as that of *any* putative father. That is not to say that due process requires actual notice to every putative father or that adoptive parents or the State must conduct an exhaustive search of records or an intensive investigation before a final adoption order may be entered. The procedures adopted by the State, however, must at least represent a reasonable effort to determine the

---

[4] The majority's citation of *Quilloin* and *Caban* as examples that the Constitution does not require the same procedural protections for the interests of all unwed fathers is disingenuous. Neither case involved notice and opportunity to be heard. In both, the unwed fathers were notified and participated as parties in the adoption proceedings. See *Quilloin* v. *Walcott*, 434 U. S. 246, 253 (1978); *Caban* v. *Mohammed*, 441 U. S. 380, 385, n. 3 (1979).

identity of the putative father and to give him adequate notice.

## II

In this case, of course, there was no question about either the identity or the location of the putative father. The mother knew exactly who he was and both she and the court entering the order of adoption knew precisely where he was and how to give him actual notice that his parental rights were about to be terminated by an adoption order.[5] Lehr was entitled to due process, and the right to be heard is one of the fundamentals of that right, which " 'has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest.' " *Schroeder* v. *City of New York*, 371 U. S. 208, 212 (1962), quoting *Mullane* v. *Central Hanover Trust Co.*, 339 U. S. 306, 314 (1950).

The State concedes this much but insists that Lehr has had all the process that is due to him. It relies on § 111–a, which designates seven categories of unwed fathers to whom notice of adoption proceedings must be given, including any unwed father who has filed with the State a notice of his intent to claim paternity. The State submits that it need not give notice to anyone who has not filed his name, as he is permitted to do, and who is not otherwise within the designated catego-

---

[5] Absent special circumstances, there is no bar to requiring the mother of an illegitimate child to divulge the name of the father when the proceedings at issue involve the permanent termination of the father's rights. Likewise, there is no reason not to require such identification when it is the spouse of the custodial parent who seeks to adopt the child. Indeed, the State now requires the mother to provide the identity of the father if she applies for financial benefits under the Aid to Families with Dependent Children Program. See n. 2, *supra*. The State's obligation to provide notice to persons before their interests are permanently terminated cannot be a lesser concern than its obligation to assure that state funds are not expended when there exists a person upon whom the financial responsibility should fall.

ries, even if his identity and interest are known or are reasonably ascertainable by the State.

I am unpersuaded by the State's position. In the first place, § 111–a defines six categories of unwed fathers to whom notice must be given even though they have not placed their names on file pursuant to the section. Those six categories, however, do not include fathers such as Lehr who have initiated filiation proceedings, even though their identity and interest are as clearly and easily ascertainable as those fathers in the six categories. Initiating such proceedings necessarily involves a formal acknowledgment of paternity, and requiring the State to take note of such a case in connection with pending adoption proceedings would be a trifling burden, no more than the State undertakes when there is a final adjudication in a paternity action.[6] Indeed, there would appear to be more reason to give notice to those such as Lehr who acknowledge paternity than to those who have been adjudged to be a father in a contested paternity action.

The State asserts that any problem in this respect is overcome by the seventh category of putative fathers to whom notice must be given, namely, those fathers who have identified themselves in the putative fathers' register maintained by the State. Since Lehr did not take advantage of this device to make his interest known, the State contends, he was not entitled to notice and a hearing even though his identity, location, and interest were known to the adoption court prior to entry of the adoption order. I have difficulty with this po-

---

[6] There is some indication that the sponsor of the bill that included the notice requirements of § 111–a believed that a putative father's rights would be protected by the filing of a paternity action. In a letter to the Counsel to the Governor, Senator Pisani stated that a putative father who files with the registry should be expected to keep his address up-to-date because "such a father has elected not to avail himself of his right . . . to initiate a paternity proceeding, but, rather, has chosen the less involved procedure of filing a 'notice of intent' which will *also* protect his right to notice of subsequent proceedings affecting the child." App. to Brief for Attorney General of New York 35a (emphasis added).

sition. First, it represents a grudging and crabbed approach to due process. The State is quite willing to give notice and a hearing to putative fathers who have made themselves known by resorting to the putative fathers' register. It makes little sense to me to deny notice and hearing to a father who has not placed his name in the register but who has unmistakably identified himself by filing suit to establish his paternity and has notified the adoption court of his action and his interest. I thus need not question the statutory scheme on its face. Even assuming that Lehr would have been foreclosed if his failure to utilize the register had somehow disadvantaged the State, he effectively made himself known by other means, and it is the sheerest formalism to deny him a hearing because he informed the State in the wrong manner.[7]

No state interest is substantially served by denying Lehr adequate notice and a hearing. The State no doubt has an interest in expediting adoption proceedings to prevent a child from remaining unduly long in the custody of the State or foster parents. But this is not an adoption involving a child in the custody of an authorized state agency. Here the child is in the custody of the mother and will remain in her custody. Moreover, had Lehr utilized the putative fathers' register, he would have been granted a prompt hearing, and there was no justifiable reason, in terms of delay, to refuse him a hearing in the circumstances of this case.

The State's undoubted interest in the finality of adoption orders likewise is not well served by a procedure that will

---

[7] In *Stanley* v. *Illinois*, 405 U. S. 645 (1972), the Court held that the Constitution forbids a State to remove illegitimate children from their father's custody without notice and an opportunity to be heard. The offensive provision in the Illinois law at issue there was a presumption that an unwed father was not a fit parent. Today the Court indulges in a similar and equally offensive presumption—that an unwed father who has not filed a notice of intent to claim paternity has abandoned his child and waived any right to notice and hearing. This presumption operates regardless of the fact that the father has instituted legal proceedings to establish his rights and obligations.

deny notice and a hearing to a father whose identity and location are known. As this case well illustrates, denying notice and a hearing to such a father may result in years of additional litigation and threaten the reopening of adoption proceedings and the vacation of the adoption. Here, the Family Court's unseemly rush to enter an adoption order after ordering that cause be shown why the filiation proceeding should not be transferred and consolidated with the adoption proceeding can hardly be justified by the interest in finality. To the contrary, the adoption order entered in March 1979 has remained open to question until this very day.

Because in my view the failure to provide Lehr with notice and an opportunity to be heard violated rights guaranteed him by the Due Process Clause, I need not address the question whether § 111–a violates the Equal Protection Clause by discriminating between categories of unwed fathers or by discriminating on the basis of gender.

Respectfully, I dissent.