617 So.2d 1067 (1993)
Nelson RIVERA-BERRIOS, Appellant,
v.
The ADOPTION CENTRE, INC., Appellee.
No. 92-2313.
District Court of Appeal of Florida, Fifth District.
March 26, 1993.
Rehearing Denied May 19, 1993.
Barry Apfelbaum, Orlando, for appellant.
Heidi M. Tauscher, Orlando, and Thomas R. Mooney of Meyers, Mooney, Schott & Meyers, Orlando, for appellee.
PER CURIAM.
AFFIRMED.
GRIFFIN and DIAMANTIS, JJ., concur.
HARRIS, J., dissents with opinion.
HARRIS, Judge, dissenting.
A petition for dependency and for termination of parental rights as to a two-day-old infant was filed on January 24, 1992 by *1068 The Adoption Centre, Inc., a child placing agency. The affidavit of the natural mother stated that the natural father's first name is Nelson, but that she did not know his last name and that his address was unknown. The affidavit also alleged that the natural father (1) is not in the military; (2) has not been established by court proceeding to be the father; (3) has not been informed of the pregnancy and birth of the child; (4) has not acknowledged his paternity in writing; (5) has not provided support; and (6) has not shown interest in supporting or caring for the child. A notice of petition for adoption was published.
On March 2, 1992 the trial court entered a form final judgment of termination of parental rights. The final judgment found that the child placing agency proved by clear and convincing evidence that the natural father had not contacted the child, requested visitation, or made effort to support the child in such manner as to evince a settled purpose to assume all parental duties and that the child was therefore neglected and abandoned. The final judgment stated that all of the elements of section 39.467(2) of the Florida Statutes (1991) were met and that the allegations of the petition were proved by clear and convincing evidence.
On July 2, 1992 Nelson Rivera-Berrios, the natural father, filed a motion to vacate the final judgment of termination of parental rights. He alleged that he was denied due process in the proceedings which resulted in the order of adjudication of March 2, 1992 and that the findings of the court were based on fraudulent misrepresentations of fact. A hearing on the motion to vacate was held on July 23, 1992.
At the hearing the natural mother admitted that the affidavit was untrue.
Q: Why did you answer those questions falsely?
A: Because they would probably try to find Nelson and tell him that I was pregnant and they ... I'm sure he would've come forth if he would've found out. They would have tried to get ahold of him, which I didn't want to happen.
She stated that she had broken off her relationship with her former boyfriend, Frank, who is the father of her four-year-old son, when she began seeing the natural father. When she told the natural father she was pregnant, she also told him that since she already had a four-year-old son, she couldn't "see having another baby." She stated that the natural father wanted to get married and raise the child, and that he told her if she didn't want to marry him he would raise the baby with help from his family. Instead, she decided to return to Frank and refused any further contact with the natural father. It was not until about June 23, 1992, that she informed the natural father that she had given birth to the child during the previous January. She testified that the natural father was surprised but happy and wanted to get the baby back. The natural father testified, without contradiction, that the mother told him she wouldn't have another baby and that he believed she intended to have an abortion. He went to her apartment every day for a month to talk to her about the baby, but she told him to leave her alone. He saw her briefly some time later when she brought her car to his place of employment for service, and he believed she had had an abortion because she was thin. He agreed that it was on June 23, 1992 that the natural mother told him that she had given birth to the baby and had placed her for adoption. He immediately took steps to gain custody of the child.
The trial court entered an order on July 30, 1992 granting the natural father's motion to vacate the final judgment of termination of parental rights. The order stated that because the natural mother knew of the natural father's whereabouts, she had not made a diligent search and inquiry to satisfy the requirements of effective service by publication.
The trial court, however, subsequently withdrew its order of July 30, finding instead that the natural father was not entitled to notice and therefore any defects in the service were of no consequence. The trial court also found there was clear and convincing evidence that the natural father abandoned the child in that his efforts to be *1069 a parent were only marginal and did not evince a settled purpose to assume all parental duties. The trial court denied the natural father's motion to vacate the final judgment of termination of parental rights. I would reverse.
I would hold that section 39.462(1)(a)2, at least as applied to this case, is unconstitutional in that it has deprived the natural father of due process of law. This provision indicates that the father of the child is entitled to personal service only if: (a) the child was conceived or born while the father was married to the mother; (b) the child is his by adoption; (c) the child has been established by a court proceeding to be his child; (d) he has acknowledged his paternity in a writing signed in the presence of a competent witness and filed with HRS; or (e) he has provided the child with support in a repetitive, customary manner.
Perhaps under some fact patterns section 39.462(1)(a)2 would satisfy constitutional requirements. However, if the statute is held to authorize termination of this father's parental rights  when the mother knew his name, address and interest in the child  without notice, then the statute is unconstitutional. How can the best possible father prove his merit if he is denied the opportunity to do so merely because the mother is willing to file a false affidavit for consideration by the court?
I recognize that in Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), the United States Supreme Court upheld a New York statute similar to (but not quite as restrictive as) the one involved in this case. The majority holding, however, was justified on the basis that the putative father had paid no support and had minimal contact with the child for over two years. The court made this distinction:
When an unwed father demonstrates a full commitment to the responsibilities of parenthood by "com[ing] forward to participate in the rearing of his child," Caban [v. Mohammed], 441 U.S. 380 at 392, 99 S.Ct. [1760] at 1768 [60 L.Ed.2d 297 (1979)], his interest in personal contact with his child acquires substantial protection under the Due Process Clause. At that point, it may be said that he "act[s] as a father toward his children." Id. at 389, n. 7, 99 S.Ct. at 1766, n. 7... .
The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie. [Emphasis added].
Lehr, 463 U.S. at 261-62, 103 S.Ct. at 2993-94.
The clear implication of this statement by the United States Supreme Court is that if a father does all that he can to develop the father-child relationship, the constitution will protect his interest and require notice and an opportunity to be heard before such relationship can be terminated.
In our case, the father, upon learning of the pregnancy, proposed marriage to the mother. It is submitted that the proposal, as a matter of law, was an offer to pay, or to be responsible for, the mother's medical expenses and an acknowledgment of financial responsibility to the child. The proposal alone would have assured him notice under the New York statute. When the mother refused, the father offered to raise the child himself and permit the mother visitation. Instead, he was led to believe that the mother intended to have an abortion. He was then denied any further relationship with the mother. When he subsequently learned of the birth of his child and the pending adoption proceeding, he immediately sought relief in court. What more could this father have done?
Appellee criticizes the father because he took no action to stop the threatened abortion. This criticism is unjustified. Perhaps the father recognized the mother's superior right to make this pre-birth decision or perhaps he sensed the futility of challenging *1070 her decision in court. Jones v. Smith, 278 So.2d 339 (Fla. 4th DCA, 1973).
Even though the trial court denied the father the right to notice, apparently in an abundance of caution, it also ruled that he abandoned the child because "his efforts were only marginal efforts that do not evince a settled purpose to assume all parental duties." This finding, according to the trial court, was because the couple engaged in mere "recreational sex" (as opposed, I presume, to engaging in intercourse for the express purpose of procreation). Further, the court noted that the father failed to expend any funds to "assist with the mother's medical needs, expenses or well-being." The court did not comment on the father's belief that the mother was electing an abortion. Finally, the court found significant the fact that "the father has never seen the child nor incurred any expenses in regard to her." In other words, because the father did not intend to impregnate the mother, did not offer to pay her expenses (the only expenses the father could have anticipated would be to abort the child), and did not attempt to see the child (that he believed to have been aborted), he is held to have abandoned the child.
I trust the court is not implying that all children from unplanned pregnancies are subject to adoption. And, from the father's perspective, it is difficult to see how agreeing to pay for an abortion would indicate an intent to develop a meaningful father/child relationship. And finally, the failure to see and the failure to pay the expenses for a child that one does not know exists hardly establishes the abandonment of that child.
The mother in this case led the father to believe she planned to abort this child. In doing so, she prevented the father from paying birth and child care expenses, from visiting the child, and even from filing an acknowledgment of his paternity with HRS. She then compounded this deception by lying to the court (in her initial affidavit presented at the original hearing) about the father's knowledge of this pregnancy and birth and about her own awareness of the father's full name and address. In holding as it does today, the majority essentially has approved the mother's actions and has thereby deprived the father of his constitutionally protected due process rights under the United States Constitution.
The best interest of the child, and the delay that protracted litigation entails is, of course, of concern. It may well be that the child would be better off being raised by a stable, financially superior couple than by this single male father who works in a service station. There are, of course, many children being raised by single parents in this same socioeconomic condition who might "be better off" with more stable, more affluent, more educated parents. But that is not the test. There is, in Florida, a
strong public policy ... in favor of the natural family unit ... [and] a natural parent of a child born out of wedlock should be denied custody only where it is demonstrated that the parent is disabled from exercising custody or such custody will, in fact, be detrimental to the welfare of the child.
In re guardianship of D.A. McW., 460 So.2d 368 (Fla. 1984). [Citation omitted.]
Therefore, the issue is not whether the prospective adoptive parents would be "better" parents but rather whether this father has, in fact, abandoned his child and forfeited his right to prove that he is an able father.
Under the constitution, a parent (father or mother) who shows interest in raising and providing for his or her child must be given a fair opportunity to contest the termination of his or her parental rights. The father was not afforded that opportunity in this case, and I would therefore reverse.