## IN RE A MINOR CHILD

District Court of American Samoa

AD No. 51-95

June 23, 1995

Before WARD, District Court Judge.

Counsel:        For Petitioners, Robert A. Porter, L.P.

Order on Motion to Set:

This matter came regularly before the court upon a petition for adoption being filed on June 9, 1995, and "a Motion to Set a date of Adoption Hearing" being filed on the same date. The petition is captioned for a single petitioner while the motion is captioned for joint petitioners.

■ Although the petition generally follows the statutory requirements of A.S.C.A. § 45.0420, neither subsection (a) nor subsection (d) of that statute was addressed in these filings. Subsection (a) requires a petition for adoption to be filed not later that 30 days after the child is placed in the home of the adoptive applicants for the purpose of adoption unless the court finds that there was reasonable causes or excusable neglect for not timely filing the petition. If the court does so find, "[t]he court then fixes a date for the hearing." A.S..C.A. § 45.0420(a).

The instant petition states that the petitioner(s) have raised the child since birth, some eight years ago. The petition does not address A.S.C.A. § 45.0420(a) on its face and no separate motion for a pre-adoption hearing supported by legal memorandum has been filed.

Even if the court were to engage in the legal fiction that the 8 year old child raised by petitioner(s) was technically "first placed in the home of the adoptive applicants for the purpose of adoption" as of the date of the order of relinquishment by the High Court, that order was dated April 12, 1995, well over 30 days before the "Petition for Adoption" was filed with this court on June 9, 1995.

■ The petition for adoption also fails to be a accompanied by a statement of any fee charged relative to the adoption as required by A.S.C.A. § 45.0420(d). That statement must also include a clause that no additional fees are to be charged.

■ On page two, line 10 of the petition appears the statement: "There are no guardians appointed in this matter". This phrase is always disturbing to the court and all the more so when included in adoption petitions that are filed weeks, months, or even years after the mandatory 30 day period after placement. Under the statutory scheme whereby the High Court hears relinquishment and termination of parental rights actions and the District Court separately hears the subsequent adoption actions, the only way for the government to monitor the minor child's best interests throughout this process is to appoint a *Guardian of the person* of the minor child. *See* A.S.C.A. § 45.0103(16). The logical choice for any such appointment would be the Child Protective Services Agency, Department of Human Resources, which could then actively monitor the minor child and his home environment until the decree of adoption is finally issued.

22

■ There are several other problems facing the High Court, the District Court, and especially citizens seeking to adopt children in the Territory under the cumbersome, costly, and mostly cumulative procedures mandated by the Juvenile Justice Act of 1980, A.S.C.A. § 45.0101 *et seq.,* ("Juvenile Justice Act of 1980") to perfect a child's adoption. For years the High Court and District Court have struggled to fashion a Samoan "silk purse" out of this stateside "sow's ear" of a statute. Although this Act may work fine in Colorado, it has little effective application to relinquishment or termination of parental rights or adoptions in Samoa. This Act was designed to work in states where, in a typical case, the following statutory procedures would be followed. Using the example of an unwed mother desiring to give up the rights to her child, in the several states the procedures to be followed would be:

(a) The unwed mother would be counseled by hospital social service personnel as to her options of keeping the child, suing the natural father for child support, or having the state bring suit on her behalf, or giving up the child for adoption;

(b) If the unwed mother, after counseling, decided to put the child up for adoption, the social services agency would petition the appropriate court for relinquishment of parental rights;

(c) That court would hold a hearing, generally before or immediately after the unwed mother gave up custody of the child to the state social services agency. The court would also determine if the natural father had acquired any parental rights which required relinquishment or termination pursuant to *Lehr v. Robertson*, 463 U.S. 248 (1983), and the court would decide if the best interests of the parent(s) and child required the parental rights be relinquished or terminated;

(d) The custody and guardianship of the child in cases where parental rights were relinquished or terminated, would then be granted by the court to the state social services agency. That agency, usually with prior court approval would effect a child placement with pre-approved couples desiring to adopt a child;

(e) As soon as possible after the placement of the child with the prospective adoptive parents, a petition for adoption would be filed with the court and set for a hearing; and

(f) At the adoption hearing the court would hear testimony from the state social services personnel who had been monitoring the child's

23

placement and determine, with the consent of that agency, whether the best interest of the child would be served by granting the adoption.

Yet when these rigid statutory procedures are compared with traditional child rearing and child placement practices in Samoa, at almost no point can the statutes be bent to fit the local situation, as required of the court under the legislature's policy declarations set forth under A.S.C.A. § 45.0102.

■ The typical relinquishment or termination of parental rights action does not come before the court until months, or more, usually years, after the natural parent or parents have *placed* the child with their parents, childless brothers or sisters, cousins, close friends, fellow church members, etc. Such traditional placements by the natural parent or parents serve a vital cultural interest in strengthening extended family ties and, in certain circumstances, creating new family ties and alliances. The problem is, by statute, parents who follow such local customs are technically subjecting themselves to potential criminal prosecution under A.S.C.A. § 45.0370(2) which provides that "[a]ny adult who ..... neglects, or abandons a child is guilty of a Class A Misdemeanor" punishable by up to one year imprisonment or a $1,000.00 fine or both.

It is also difficult for the courts to meet the legislative mandates of preserving aiga ties and maintaining the child/parent relationship except when the child's welfare or safety would otherwise be endangered. *See* A.S.C.A. § 45.0102. Most cases never come before the court until years after the child has been *given* to the prospective adoptive parents. Of what real value is counseling to the unwed mother years after she *voluntarily* surrendered the child? How does the court preserve the parent/child relationship after the child had already bonded with the prospective adoptive parents? And where do the best interests of the child lie, when, after the child had been raised by the prospective adoptive parents for years, the court must consider whether the natural parents should regain custody of the child? And finally, why are local citizens who desire to adopt a child put to the expense, time, and difficulty of two separate petitions and two court hearings to receive official approval of a years old parent/child relationship?

■ Although the pre - 1980 adoption statutes were subject to some abuses, at least they provided a more culturally compatible and economical statutory scheme than the present statutes. The District Court hears well over 100 adoption actions each year and an equal or greater number of relinquishment or termination of parental rights actions are separately heard by the High Court. Child Protective Services conducts well over 100 investigations and home studies per year after petitions for relinquishment or termination of parental rights are filed in the High

24

Court. All of this considerable effort usually occurs well after the fact and serves no real purpose save to legitimize the longstanding relationships between the minor child and its adoptive parents.

The instant case, involving an eight year old child who has been raised since birth by the prospective adoptive parents now seeking to adopt the child, is reflective of the problems outlined above. Although the Juvenile Justice Act of 1980 contains several workable chapters dealing with child shelter, care, support, and juvenile delinquency adjudications, the legislature may wish to reexamine those chapters dealing with adoption proceedings, including relinquishment or termination of parental rights for purposes of adoptions, and amend these statutes to work more effectively within the unique local context of the Samoan extended family child rearing practices. The present statutes undoubtedly work well in the several states but are difficult to apply to the bulk of the local adoption proceedings processed by the court.

In the interim, however, this court must enforce the statutory requirements as enacted by the legislature. All petitions for adoption must be timely filed and address all of the statutory requirements of A.S.C.A. § 45.0420(a), (b), (c), and (d). The Clerk of Courts shall serve all members of the Bar with a copy of this order so that all future petitions for adoption filed with the court fully comply with statutory mandates. The motion to set is denied.

It is so ordered.