BRYAN, Judge.
C.W.S. (“the father”) appeals from a judgment entered by the Baldwin Juvenile Court (“the juvenile court”) that adjudicated him the father of C.L.S. (“the child”), awarded C.M.P. (“the mother”) sole custody of the child, awarded the father supervised visitation with the child, and ordered the father to pay $1,066 a month in child support.[1]

*866
Procedural History

On July 5, 2011, the mother filed a petition to establish the paternity of the child, and that action was assigned case no. CS-11-900266. The mother alleged that she and the father had never married, that the father was the father of the child, that she was the proper party to have custody of the child, and that the father should be ordered to pay child support. The mother further alleged that the child had lived with her until the father took the child on July 1, 2011, and that the father had refused to return the child. On the same date, the mother filed an emergency petition for an ex parte order seeking immediate custody of the child. On July 6, 2011, the juvenile court entered an order granting the mother’s request for ex parte custody of the child. On July 7, 2011, the juvenile court amended its ex parte order to order the sheriffs department to assist the mother in obtaining custody of the child. The father filed an answer, and then an amended answer, to the mother’s paternity petition, and he admitted that he is the father of the child. The father requested joint custody of the child.
The juvenile court conducted an ore ten-us hearing on October 4, 2011. On November 2, 2011, the juvenile court entered a judgment that adjudicated the father as the father of the child and awarded the mother sole custody of the child. The father was awarded visitation that “shall occur at times mutually agreed upon by the [pjarties and it shall be in a public place during daylight hours only and the [father] shall be supervised by someone the [mother] approves of.” The father was ordered to pay $1,066 a month in child support, and that award was made retroactive to July 7, 2011. The juvenile court determined the father’s child-support ar-rearage to be $3,864.
On November 10, 2011, the father filed a timely postjudgment motion arguing that the amount of child support he was ordered to pay did not comply with Rule 32, Ala. R. Jud. Admin.; that the juvenile court should modify the amount of retroactive child support due to the improper calculation of his child-support obligation; that the award of visitation was contrary to the evidence presented; and that, at a minimum, he should have been awarded standard “Schedule A” visitation. The juvenile court purported to deny the father’s postjudgment motion on November 29, 2011, 19 days after the father filed his postjudgment motion. However, because the Rules of Juvenile Procedure apply in this case, see H.J.T. v. State ex rel. M.S.M., 34 So.3d 1276, 1278-79 (Ala.Civ.App.2009), the father’s postjudgment motion was denied by operation of law on November 24, 2011, i.e., 14 days after his postjudgment motion was filed. See Rule 1(B), Ala. R. Juv. P. (“A postjudgment motion [in a juvenile proceeding] is deemed denied if not ruled on within 14 days of filing.”).[2] The father filed a notice *867 of appeal on December 6, 2011, 12 days after his postjudgment motion was denied by operation of law. See Rule 4(a)(1), Ala. R.App. P. (providing that an appellant has 14 days to appeal a final order or judgment entered by a juvenile court); and Rule 4(a)(3), Ala. R.App. P. (providing that a timely postjudgment motion tolls the time for taking an appeal).

Issues

The father raises three issues for this court’s review on appeal: (1) whether the juvenile court erred by failing to award him a minimum schedule of visitation; (2) whether the juvenile court erred by requiring that his visitation with the child be supervised; and (3) whether the juvenile court erred by determining the amount of his child-support obligation.

Facts

At the ore tenus proceeding in October 2011, the mother, the father, and several witnesses testified. The mother was 25 years old at the time of the ore tenus hearing, and she testified that she and the father initially lived together from March 2008 through August 2010. The child was born during that time, in March 2009, and the mother testified that she had been the primary caregiver of the child. The mother estimated that she had left the father alone with the child less than five times during the child’s life. In August 2010, the mother and the child moved out of the father’s home because, according to the mother, it was an unsafe environment caused by the father’s father (“the paternal grandfather”). According to the mother, the paternal grandfather was an alcoholic and a drug addict and had a criminal history. The mother and the child moved to Wisconsin on October 22, 2010, to care for the mother’s mother. According to the mother, the father made no attempt to visit the child between August 2010 and May 2011, despite the fact that her mother offered to pay the father’s travel expenses to visit the child in Wisconsin. The mother and the child returned to Baldwin County in May 2011, and, at that time, the father began living with the mother and the child.
The mother testified that, during her relationship with the father, there had been two physical altercations between the parties. On one occasion, the father pushed the mother head first into a garden bathtub, and on another occasion, the father pushed the mother into a big-screen television after he had been consuming alcohol. On both of those occasions, the mother took the child and left the parties’ home, and the mother indicated that she had suffered bruising as a result of the father’s actions. The father did not dispute that the “garden tub” altercation had occurred, and he testified that he did not remember pushing the mother into a television. The father stated that he had quit consuming alcohol approximately two months before the ore tenus hearing. Tammy Sylvester, a friend of the mother who also provided child care for the child, testified that the mother had come to her home with the child on a few occasions after fighting with the father, and, on at least one occasion, Sylvester had noticed bruising and a mark on the mother’s back. *868 It was undisputed that the parties got into an argument on July 1, 2011, that caused their separation. According to the mother, the parties had a disagreement after she found a loaded gun in their home on top of the cabinets in their kitchen. The father stated that the mother hit him with a pair of safety goggles and with her hands during that argument. The father called the police and told them that the mother had hit him and had pushed him. However, the father admitted that he had subsequently recanted his allegation that the mother had hit him. The mother was arrested, and she was incarcerated for approximately 12 hours.[3] Upon her release, the mother contacted the father, and the father told her that he had the child as a condition of her bond. However, after meeting with an attorney, the mother discovered that there was no such condition on her bond. The father admitted that he had not allowed the mother to take the child, even after the juvenile court issued the original ex parte order, and that he allowed the mother to take the child only after the order was amended to allow the sheriff’s department to assist the mother. The mother had exercised custody of the child from approximately July 7, 2011, until the time of the hearing in October 2011.
In September 2011, the mother and the father attended counseling sessions with their pastor. The counseling ended after the father, in the mother’s opinion, “excessively spanked” the child for “cutting up” in a restaurant. According to the mother, ever since the father took the child in early July, the child had been too afraid to sleep by himself in his bed. The mother stated that the father had not had unsupervised visitation with the child since the incident in early July because she was afraid that he would not return the child. She also stated that the father had not been around the child very often in the 15 months before the ore tenus hearing, that she was afraid the father still had alcohol issues, and that the father’s friends were not appropriate people for the child to be around.
At the time of the ore tenus hearing, the mother and the child lived in a two-bedroom apartment. The mother worked as a surgery technician at a local hospital approximately 36 hours a week earning $10.15 an hour. The mother was also in nursing school taking nine hours of classes a week. According to the mother, she paid health insurance for herself and the child at a cost of $317 a month. The mother stated that, since she filed the paternity action, the father had provided her $400 in support.
Sylvester testified that she provided child care for the child while the mother was working or in school and that she charged the mother $140 a week. She stated that she had cared for the child for most of the child’s life. Sylvester testified that she had seen the father around the child only a few times but that the child was “very standoffish” around the father.
The father, who was 33 years old at the time of the hearing, testified that he was employed as an electrician earning $21 an hour and working approximately 40 hours a week. The father stated that he had never cared for the child for two or three straight days, that his home was not furnished, and that the child, if he spent the night, would have to share a blow-up mattress with him to sleep.

Standard of Review

“In any case in which the court makes findings of fact based on evidence presented ore tenus, an appellate court will presume that the trial court’s judgment based on those findings is correct, and it *869 will reverse that judgment only if it is found to be plainly and palpably wrong. Ex parte Perkins, 646 So.2d 46 (Ala.1994). The presumption of correctness accorded the trial court’s judgment entered after the court has heard evidence presented ore tenus is especially strong in a child-custody case. Id.”
Ex parte Byars, 794 So.2d 345, 347 (Ala.2001).

Discussion

On appeal, the father first argues that the juvenile court erred by failing to set forth a specific award of visitation in its final judgment. A determination of a noncustodial parent’s visitation with a child is left to the sound discretion of the juvenile court, after a consideration of the best interests of the child, and this court will not reverse an award of visitation unless the record demonstrates that the juvenile court exceeded its discretion in determining the visitation award. A.M.B. v. R.B.B., 4 So.3d 468, 471-72 (Ala.Civ.App.2007). However, this court has also held that a trial court commits reversible error when it fails to provide a noncustodial parent with a “sufficient, specified visitation schedule to rely upon, independent of the custodial parent’s discretion.” Pratt v. Pratt, 56 So.3d 638, 644 (Ala.Civ.App.2010). We have further held that “an order of visitation granting a custodian so much discretion over a visitation schedule that visitation could be completely avoided if the custodian so desired should be deemed to be an award of no visitation and to be in violation of the rights of the noncustodial parent.” Id. at 643-44.
In the present case, the father’s visitation with the child may take place only at a time “mutually agreed upon by the [pjarties.” Therefore, it is conceivable that the mother could completely avoid allowing the father to visit the child if she so desired. Considering the visitation awarded to the father in the juvenile court’s judgment, we agree that the juvenile court erred by failing to award the father a specific visitation schedule that he could rely upon, independent of the mother’s discretion. Accordingly, we reverse that aspect of the juvenile court’s judgment awarding the father visitation only at mutually agreeable times, and we remand the cause with instructions to the juvenile court to “establish a sufficiently specific visitation order” for the father. Id. at 645.
Next, the father argues that the juvenile court erred by requiring his -visitation with the child to be supervised.
“ ‘The trial court has broad discretion in determining the visitation rights of a noncustodial parent, and its decision in this regard will not be reversed absent an abuse of discretion.’ Carr v. Broyles, 652 So.2d 299, 303 (Ala.Civ.App.1994). In exercising its discretion over visitation matters, ‘“[t]he trial court is entrusted to balance the rights of the parents with the child’s best interests to fashion a visitation award that is tailored to the specific facts and circumstances of the individual case.” ’ Ratliff v. Ratliff, 5 So.3d 570, 586 (Ala.Civ.App.2008) (quoting Nauditt v. Haddock, 882 So.2d 364, 367 (Aa.Civ.App.2003) (plurality opinion)). A noncustodial parent generally enjoys ‘reasonable rights of visitation’ with his or her children. Naylor v. Oden, 415 So.2d 1118, 1120 (Ala.Civ.App.1982). However, those rights may be restricted in order to protect children from conduct, conditions, or circumstances surrounding their noncustodial parent that endanger the children’s health, safety, or well-being. See Ex parte Thompson, 51 So.3d 265, 272 (Ala.2010) (‘A trial court in establishing visitation privileges for a noncustodial parent must consider the best interests and *870 welfare of the minor child and, where appropriate, as in this case, set conditions on visitation that protect the child.’). In fashioning the appropriate restrictions, out of respect for the public policy encouraging interaction between noncustodial parents and their children, see Ala.Code 1975, § 30-3-150 (addressing joint custody), and § 30-3-160 (addressing Alabama Parent-Child Relationship Protection Act), the trial court may not use an overbroad restriction that does more than necessary to protect the children. See Smith v. Smith, 887 So.2d 257 (Ala.Civ.App.2003), and Smith v. Smith, 599 So.2d 1182, 1187 (Ala.Civ.App.1991).”
Pratt v. Pratt, 56 So.3d at 641.
The juvenile court did not make any specific findings of fact in its judgment; accordingly, this court “will assume that the [juvenile] court made those findings necessary to support its judgment, unless such findings would be clearly erroneous.” Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996). The juvenile court heard evidence from which it could have concluded that the father was the perpetrator of domestic or family abuse, as that term is defined in § 30-3-130, Ala.Code 1975, part of the Custody and Domestic or Family Abuse Act, § 30-3-130 et seq., Ala. Code 1975 (“the Act”).[4] The mother testified to two incidences of physical violence by the father that caused her bruising, and she further indicated that, on those occasions, she had taken the child with her out of the home shared by the parties. Section 30-3-135, Ala.Code 1975, also part of the Act, permits a trial court to award visitation to a parent who committed domestic or family violence “only if the court finds that adequate provision for the safety of the child and the parent who is a victim of domestic or family violence can be made.” See § 30-3-135(a), Ala.Code 1975. Section 30-3-135(b)(2), Ala.Code 1975, specifically permits a trial court, in an effort to make adequate provision for the safety of the child, to “[o]rder visitation supervised in a manner to be determined by the court.” Accordingly, we cannot conclude that the juvenile court exceeded its discretion by ordering the father’s visitation with the child to be supervised.[5]
*871 The father also argues that the juvenile court erred by giving the mother sole authority to determine who may supervise his visitation with the child because, he argues, the mother could conceivably fail to approve of anyone to supervise his visitation with the child. Our review of the record reveals that the father has raised this argument for the first time on appeal. Accordingly, this court may not consider this argument. See Andrews v. Merritt Oil Co., 612 So.2d 409, 410 (Ala.1992) (holding that an appellate court cannot consider arguments raised for the first time on appeal).[6]
Finally, the father argues that the juvenile court erroneously determined the amount of his child-support obligation and, thus, that the determination of his child-support arrearage is also erroneous. The father argues that the health-insurance cost that the juvenile court used in its calculation of his child-support obligation differed from the amount the mother testified that she paid for monthly health insurance during the ore tenus hearing. However, our review of the record reveals that the father did not raise this argument before the juvenile court. It is axiomatic that this court cannot reverse a judgment of a lower court based on grounds that were not first presented to the lower court for consideration. See Andrews v. Merritt Oil Co., supra; and A.M.F. v. Tuscaloosa Cnty. Dep’t of Human Res., 75 So.3d 1206, 1210 n. 3 (Ala.Civ.App.2011) (quoting Birmingham Hockey Club, Inc. v. National Council On Comp. Ins., Inc., 827 So.2d 73, 80 (Ala.2002)) (noting that ““““there is something unseemly about telling a lower court it was wrong when it never was presented with the opportunity to be right.(emphasis omitted)).
The father also argues that his child-support obligation was erroneously calculated because the juvenile court used an amount of child-care costs greater than what is provided for in the child-care-costs guidelines developed by the Alabama Department of Human Resources (“DHR”). See Rule 32(B)(8), Ala. R. Jud. Admin. (“Child-care costs shall not exceed the amount required to provide care from licensed source for the children, based on a schedule of guidelines developed by [DHR].”). The record reflects that the CS-42 Child-Support Guidelines form (“the CS-42 form”) in the record that was used to determine the father’s child-support obligation determined that the childcare costs totaled $84 a week, which is the maximum allowable in Baldwin County for a licensed Family Day Care Center when the child is between 30 months and 12 years old.[7] At the postjudgment-motion hearing, the father had retained a new attorney and his trial counsel was not present. The mother’s attorney stated that he and the father’s trial attorney had discussed the maximum allowable childcare costs and that they had made adjustments to the CS-42 form submitted to the juvenile court. The father’s new attorney stated that he noticed that the actual costs of child care that the mother paid exceeded the maximum amount allowed and that *872 he just wanted to be sure that “the cap” had been used.
However, on appeal, the father argues that the child-care costs used in the CS-42 form were incorrect because there was no evidence indicating that Sylvester was a licensed child-care provider; thus, according to the father, the juvenile court should have used the rate provided in the childcare-costs guidelines for an “informal care provider,” which, at the time of the ore tenus hearing, was $35 a week. Our review of the record reveals no evidence indicating whether Sylvester is a licensed child-care provider or an informal care provider. Regardless, the record reveals that the father did not first present this argument to the juvenile court for consideration. Accordingly, we may not address it on appeal. See Andrews, supra. Finding no merit in the father’s argument that his child-support calculation was erroneously determined, we also conclude that the juvenile court did not err in determining the father’s child-support arrearage.

Conclusion

The juvenile court’s judgment is reversed insofar as the father’s visitation award failed to set forth a specific minimum schedule of visitation. Every other aspect of the juvenile court’s judgment is affirmed. The cause is remanded for proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
THOMPSON, P.J., and PITTMAN, THOMAS, and MOORE, JJ., concur.

. Although the father’s notice of appeal indicates that he appealed a judgment entered by the Baldwin Circuit Court, we note that the mother's petition was properly filed and docketed with the Baldwin Juvenile Court. See § 12-15-115(a)(6), Ala.Code 1975. There is no indication in the record that this action was transferred to the Baldwin Circuit Court. Moreover, a case designated with a "CS” case number is considered a juvenile-court action, whether it is filed in a juvenile court or in a circuit court. See HJ.T. v. State ex rel. M.S.M., 34 So.3d 1276, 1278-79 (Ala.Civ.App. 2009).
We note that the parties, at the start of the ore tenus proceeding, attempted to waive any jurisdictional defect that might exist because the paternity action was filed as a juvenile "CS” case, instead of a "DR” case in the circuit court. Even if the juvenile court had lacked subject-matter jurisdiction over the paternity action, and we conclude that it did *866 not, neither the parties nor the juvenile court had the ability to waive such a jurisdictional defect. See J.T. v, A.C., 892 So.2d 928, 931 (Ala.Civ.App.2004) (quoting CJ.L. v. 868 So.2d 451, 453 (Ala.Civ.App.2003)) (" ‘[Sjubject-matter jurisdiction may not be waived....' ”).

. The juvenile court conducted a hearing on the father's postjudgment motion on November 29, 2011, five days after the father's post-judgment motion was denied by operation of law. During the postjudgment-motion hearing, the attorneys for the parties indicated that they had agreed to allow the juvenile court to extend the time for ruling on the postjudgment motion, and there is also an indication that the parties’ agreement was put in writing and given to the juvenile-court judge. However, the only indication in the record that the parties reached an agreement to extend the time for ruling on the father’s postjudgment motion was the colloquy during *867 the postjudgment-motion hearing. Assuming that that agreement on the record satisfied the requirements of Rule 59.1, Ala. R. Civ. P. (requiring the "express consent of all the parties, which consent shall appear on the record,” in order to extend the time for ruling on a pending postjudgment motion), the agreement appeared in the record only after the postjudgment motion had already been denied by operation of law. See Rule 59.1 ("A failure by the trial court to render an order disposing of any pending postjudgment motion within the time permitted hereunder, or any extension thereof, shall constitute a denial of such motion as of the date of the expiration of the period.”).

. All charges against the mother had been dropped at the time of the ore tenus hearing.

. Section 30-3-130 defines “domestic or family abuse” as:
"an incident resulting in the abuse, stalking, assault, harassment, or the attempt or threats thereof. Abuse means any offense under Article 4 (commencing with Section 13A-6-60) of Chapter 6 of Title 13A, and under Chapter 15 (commencing with Section 26-15-1) of Title 26. Stalking means the offenses prescribed in Sections 13A-6-90 to 13A-6-92, inclusive. Assault means the offense prescribed in Sections 13A-6-20 to 13A-6-25, inclusive. Harassment means the offenses prescribed in Section 13A-11-8.”
Section 13A-6-22(a), Ala.Code 1975, provides, in pertinent part:
"A person commits the crime of assault in the third degree if:
"(1) With intent to cause physical injury to another person, he causes physical injuiy to any person; or
"(2) He recklessly causes physical injury to another person.... ”

. Although we recognize that the father testified that the mother had also perpetrated acts of domestic violence against him, the mother denied that she had hit the father and the father admitted that he had recanted his allegation that the mother had hit him. Furthermore, there was no evidence presented indicating that the alleged act of domestic violence perpetrated by the mother, if it happened, had any affect on the child. In fact, the record indicated that the child was inside while the parties were outside during the alleged act of domestic violence. In contrast, the acts of domestic violence testified to by the mother resulted in the mother's packing up the child and taking him to a friend's house.

. Although we cannot address this argument on appeal, we note that we do not agree with the father’s interpretation of the part of the juvenile court's judgment that states that the father’s visitation "shall be supervised by someone the [mother] approves of.” This aspect of the juvenile court’s judgment contains an implicit requirement that the mother must approve of someone to supervise the father's visitation with the child. In other words, the juvenile court’s judgment does not give the mother the authority to control visitation by failing to approve of anyone to supervise the father’s visitation with the child.

. This rate became effective October 1, 2009.