MOORE, Judge, dissenting.
I respectfully dissent.
In his brief to this court, TaMarkus J. King ("the biological father") argues that the Elmore Circuit Court ("the trial court") exceeded its discretion in limiting his visitation with C.T. ("the child") to three hours per month and in precluding the biological father from informing the child of his paternity. Specifically, the biological father cites *286 Lehr v. Robertson, 463 U.S. 248, 262, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), and a passage from Lehr quoted in K.H.M. v. D.L.I., 895 So.2d 950, 956 (Ala. Civ. App. 2003) (plurality opinion), for the proposition that he, as the biological father of the child, has certain parental rights to the child. The biological father argues that "the trial court's denial of [the biological father's] right to express to [the child] that [the biological father] is [the child's] father and its relegation of only three hours' visitation with his child essentially strips [the biological father] of all parental rights" and that the limited visitation awarded to the biological father "has greatly infringed on the parental rights of [the biological father] without justification or cause."
In Lehr, supra, the United States Supreme Court considered whether an unwed biological father had an absolute right to notice and an opportunity to be heard before his child could be adopted. The Court acknowledged that an unwed father has an inchoate interest in establishing a relationship with his child, but concluded that the mere existence of a biological link does not, in and of itself, establish any constitutional right to a continuing parental relationship with the child. Rather, the Court explained, an unwed biological father develops a liberty interest in personal association with his child when he demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of the child and building a substantial relationship with the child. The Court said:
"The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a state to listen to his opinion of where the child's best interests lie."
463 U.S. at 262, 103 S.Ct. 2985 (footnote omitted). Because the unwed biological father in Lehr had not supported his child and had only rarely seen the child in the two years since her birth, the Court concluded that he did not have a sufficient liberty interest in maintaining a relationship with the child requiring the State of New York to provide him notice and an opportunity to be heard before the child could be adopted. In K.H.M., Presiding Judge Yates relied on the above-quoted passage from Lehr in deciding that an unwed father, whom the Montgomery Juvenile Court found had not abandoned his child, was entitled to pursue a relationship with that child.
In his brief to this court, the biological father argues that Lehr and K.H.M. support his claim that he has a right to unsupervised visitation and the right to inform the child of his parentage. By citing Lehr and quoting K.H.M. only insofar as it quoted Lehr, it is clear that the biological father in this case asserts that he has a federal constitutional right to a parental relationship with the child that, he says, has been infringed upon by the trial court. However, the United States Supreme Court has been very clear that the constitutional rights of an unwed father depend not on his biological connection to the child, but on the extent that the unwed father has seized his opportunity to develop an actual parenting relationship to the child. Based on those precedents, an unwed father who has not forged an actual parental relationship with his child despite ample opportunity to do so has no fundamental right to parent the child that would be entitled to the due-process and other protections afforded by the United States *287 Constitution. See Lehr, supra ; see also Quilloin v. Walcott, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978) (unwed biological father who assumed no substantial child-rearing responsibilities was not entitled to due process to prevent adoption of his child).
In this case, Kimberly Tillman-Gilbert ("the mother") presented more than sufficient evidence to prove that the biological father had failed to grasp his opportunities to act as a real parent to the child. According to the mother, the biological father did not provide the mother any emotional or financial support during her pregnancy despite his knowledge of his paternity. After the child was born, the biological father first failed to show for genetic testing, but eventually did undergo testing that revealed his paternity. The biological father showed some interest in the child after the results of the genetic testing were obtained, but failed to consistently communicate or visit with the child. The mother married another man who, according to the mother, has served as the actual father figure for the child. The father did not communicate with the mother about the child except very sporadically and often failed to give the child birthday or Christmas gifts. The father did not file the underlying action to seek visitation with the child until 2015, when the child was already seven and a half years old. By that time, the biological father was essentially a stranger to the child, having had no interaction of any kind with the child for years.
The biological father disputed the mother's account by presenting some evidence indicating that the mother had not facilitated his relationship with the child and that her actions had led him to lose contact with the mother and the child. The trial court observed the parties while testifying, and its determination obviously indicates that the trial court did not believe that the father presented satisfactory evidence to explain his dereliction of his child-rearing duties. The trial court did not explicitly reject the father's version of events but, when it reviews a judgment, this court must presume that the trial court made those implied findings of fact necessary to sustain its judgment provided those findings are supported by the evidence. M.J.C. v. G.R.W., 69 So.3d 197, 200 (Ala. Civ. App. 2011). The biological father specifically argued to the trial court in his postjudgment motion that the judgment violated his constitutional rights. In rejecting that argument, the trial court must have impliedly found that, despite his opportunities, the father had not formed a sufficient parental relationship with the child to be treated as a real father with constitutionally protected parental rights to the child. Based on the record before this court, I cannot conclude that the trial court was plainly and palpably wrong in reaching that factual determination. Therefore, the judgment limiting the visitation between the biological father and the child and prohibiting the biological father from informing the child of his paternity does not violate federal constitutional law as the biological father argues.
To the extent that the father argues that the trial court's judgment violates his parental rights under Alabama law, I disagree with the main opinion on that point. First, the biological father has not cited any authority for the proposition that he has a right under Alabama law to disclose his paternity to the child. Thus, pursuant to Rule 28, Ala. R. App. P., his argument on that point should not even be considered. Assuming we could consider that argument, I cannot locate any Alabama cases, or cases from other jurisdictions, recognizing the right of an unwed father to inform his natural child of his paternity. Alabama law generally holds that the mother, as the sole custodian of a child *288 born out of wedlock, see D.D. v. E.E.B., 707 So.2d 247 (Ala. Civ. App. 1997) ; Danford v. Dupree, 272 Ala. 517, 132 So.2d 734 (1961), has the right to name the child without using the surname of the natural father, see J.M.V. v. J.K.H., 149 So.3d 1100, 1103 (Ala. Civ. App. 2014). Upon establishing paternity, a legal father of a child born out of wedlock may petition to change the surname of the child, but a trial court may deny that petition if it concludes that changing the name of the child is not in the child's best interests. Id. By analogy, it would seem that a state court adjudicating the paternity of a child may likewise prohibit the legal father from disclosing his paternity if doing so is in the best interests of the child.
As in name-change cases, it would seem that the burden would have rested on the biological father to prove that disclosing his paternity to the child would be in the best interests of the child. However, the biological father did not introduce any evidence showing how the best interests of the child would be promoted by the sudden discovery of his paternity. He merely maintained, as he does on appeal, that the child should know him as his father because of their biological connection. On the other hand, the trial court heard from the mother that the child would be confused by the disclosure of his familial connection to the biological father because the child knows her husband as his father. The mother explained that the revelation of the true paternity of the child would only destabilize the family setting in which the child had thrived. Those exact same factors recently led this court, in J.M.V. v. J.K.H., supra, to conclude that a circuit court had erred in changing the surname of a child because it was not proven to be in the child's best interests. That same reasoning convinces me that the trial court did not err in prohibiting the biological father from disclosing his paternity to the child given the absence of any evidence indicating that such disclosure would serve the best interests of the child.
Turning to the visitation issue, once a court adjudicates the paternity of a child, that adjudication does not automatically bestow upon the newly declared legal father a right to standard visitation with his child. Rather, by statute, a court adjudicating paternity may include in its judgment "any other provision ... concerning ... visitation of the child." Ala. Code 1975, § 26-17-636(g). The mode and manner of visitation awarded to an unwed father in a paternity judgment is governed by the best interests of the child. See C.W.S. v. C.M.P., 99 So.3d 864, 869 (Ala. Civ. App. 2012) (stating, in an action to determine paternity of child in which juvenile court, among other things, awarded biological father supervised visitation with child, that "[a] determination of a noncustodial parent's visitation with a child is left to the sound discretion of the juvenile court, after a consideration of the best interests of the child, and this court will not reverse an award of visitation unless the record demonstrates that the juvenile court exceeded its discretion in determining the visitation award").
In deciding what form of visitation serves the best interests of the child, a trial court must consider, among many other factors, the history of the interpersonal relationship between the biological father and the child. See Ex parte Devine, 398 So.2d 686, 697 (Ala. 1981). In this case, it is undisputed that the biological father had no substantial relationship with the child. The mother summarized the history between the biological father and the child as follows:
"When you know that someone is your child, you will do anything to see them, and that is not what [the biological father]
*289 did.... Now, for a parent that knows that a child is their biological child and for them to decide to stop making any effort to take care of them and see them, that is on that person. It is not on the other parent. I will not beg anybody to take care of my son. My child has been taken care of. [The child] has been taken care of for nine whole years by me.
"....
"And by his father, [the mother's husband], without any need or effort from anybody else...."
The mother argued before the trial court that it would be unconscionable to award the biological father standard visitation in light of that history. The main opinion basically concludes that the trial court should have determined that the mother had alienated the child from the biological father, but, based on its judgment denying the biological father standard visitation, the trial court obviously viewed the conflicting evidence differently. The trial court evidently determined that the biological father had voluntarily remained absent from the life of the child and that his past failures to discharge his parental responsibilities to and for the child weighed heavily against his claim for standard visitation. On appeal from ore tenus proceedings in visitation disputes, "this court does not substitute its resolution of disputed facts for the trial court's resolution of those facts." K.D.H. v. T.L.H. III, 3 So.3d 894, 899 (Ala. Civ. App. 2008).
In reaching my conclusion that the judgment should be affirmed, I do not disagree with the general propositions that a noncustodial parent should have a meaningful opportunity to maintain a relationship with a child and that visitation between a child and a noncustodial parent should be restricted only when necessary to protect the health, safety, and well-being of the child. 274 So.3d at 285. However, when a trial court determines from sufficient evidence that an unwed father squandered his opportunity to develop a meaningful relationship with his child and that it would not be in the child's best interests to thrust the child into his unsupervised care, I find that those general propositions of law do not warrant interference with that judgment. Based on the record before us, I cannot agree that the trial court abused its discretion such that its judgment should be reversed.
Thompson, P.J., concurs.