Rel: September 13, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## SPECIAL TERM, 2024

————————————————

### SC-2024-0095

————————————————

### Ex parte J.R. and A.R.

### PETITION FOR WRIT OF CERTIORARI
### TO THE COURT OF CIVIL APPEALS

### (In re: J.B.

### v.

### Morgan County Department of Human Resources, J.R., and A.R.)

### (Morgan Juvenile Court: JU-21-12.01;
### Court of Civil Appeals: CL-2022-1288)

MITCHELL, Justice.

WRIT QUASHED.  NO OPINION.

Shaw, Sellers, Mendheim, and Cook, JJ., concur.

Parker, C.J., concurs specially, with opinion.

Bryan, J., dissents, with opinion, which Wise and Stewart, JJ., join.

PARKER, Chief Justice (concurring specially).

I concur with the Court's decision to quash the writ of certiorari. We granted certiorari review to determine whether the Court of Civil Appeals' decision to reverse the Morgan Juvenile Court's judgments determining that A.J.S. ("the child") was dependent as to J.B. ("the father") conflicts with prior decisions that hold that an appellate court must give the juvenile court's findings appropriate deference under the ore tenus standard. After reviewing the record, I agree with the Court of Civil Appeals that the juvenile court could not have found by clear and convincing evidence that the father would fail to protect the child from her mother. Appellate courts do "not reweigh the evidence but, rather, determine[] whether the findings of fact made by the juvenile court are supported by evidence that the juvenile court could have found to be clear and convincing. … When those findings rest on ore tenus evidence, [an appellate court] presumes their correctness." D.M. v. Jefferson Cnty. Dep't of Human Res., 232 So. 3d 237, 242 (Ala. Civ. App. 2017) (citing Ex parte T.V., 971 So. 2d 1, 9 (Ala. 2007)). Because I am persuaded that the Court of Civil Appeals appropriately followed this standard, I concur in quashing the writ.

I write specially to note that depriving a parent of custody of his or her child through a dependency action is unacceptable unless there is clear and convincing evidence establishing that appropriate grounds exist for finding the child dependent and for depriving the parent of custody. Both the United States Supreme Court and this Court have held that parental rights are fundamental rights that are entitled to constitutional protection. See, e.g., Meyer v. Nebraska, 262 U.S. 390, 399-403 (1923); Pierce v. Society of Sisters, 268 U.S. 510, 534-35 (1925); Ex parte J.E., 1 So. 3d 1002, 1006 (Ala. 2008). Although the United States Supreme Court has never articulated the standard of review to be applied when fundamental rights of parents are abridged, the typical rule is that the abridgement of fundamental rights receives strict-scrutiny review. See Troxel v. Granville, 530 U.S. 57, 80 (2000) (Thomas, J., concurring in the judgment); Ex parte E.R.G., 73 So. 3d 634, 645 (Ala. 2011) (plurality opinion); Ex parte Bodie, 377 So. 3d 1051, 1064-68 (Ala. 2022) (Parker, C.J., concurring in part and concurring in the result). In any case, the Constitution's protection of parental rights requires the party moving to have the child adjudicated dependent to demonstrate by clear and convincing evidence that the statutory grounds for dependency have been

4

met. <u>A.G. v. K.G.</u>, 114 So. 3d 24, 26 (Ala. 2012); <u>S.R. v. B.G.</u>, [Ms. CL-2023-0074, Nov. 3, 2023] ___ So. 3d ___ (Ala. Civ. App. 2023) (noting that the clear-and-convincing-evidence standard is required by the Fourteenth Amendment in dependency cases).

According to <u>Meyer</u>, the Fourteenth Amendment protects parental rights "long recognized at common law." <u>Meyer</u>, 262 U.S. at 399. William Blackstone repeatedly used the term "the tie[s] of nature" as the basis for the legal rights and duties of parents and children. See 1 William Blackstone, <u>Commentaries on the Laws of England</u> *442, *446. The natural tie between parents and children, of course, begins with procreation. Undoubtedly, parents owe their children duties of provision, protection, and education. <u>Id.</u> at 446. But parents owe these duties to their children because they are <u>their children</u>. In other words, the act of producing the child gives rise to the rights and responsibilities that come with parenthood.

This is still true even when a child is born out of wedlock. The common law imposed disabilities on illegitimate children's inheritance rights, apparently to provide parents an incentive to get married. See <u>id.</u> at 446. Fortunately, the Equal Protection Clause of the Fourteenth

5

Amendment forbids punishing illegitimate children for the sins of their fathers by depriving them of their inheritance. Weber v. Aetna Cas. & Sur. Co., 406 U.S. 164, 175-76 (1972). But even though the common law imposed inheritance disabilities on illegitimate children, parents still had other rights over their illegitimate children because "the ties of nature … are not so easily dissolved." 1 Blackstone, Commentaries 447. Thus, regardless of whether children are born in wedlock, "[t]he law recognizes that a higher authority ordains natural parenthood, and a fallible judge should disturb the relationship thus established only where circumstances compel human intervention." Ex parte Sullivan, 407 So. 2d 559, 563-64 (Ala. 1981) (emphasis added).

The dissent quotes from a United States Supreme Court decision that might appear to stand for the contrary proposition: "'Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring.'" Lehr v. Robertson, 463 U.S. 248, 260 (1983) (quoting Caban v. Mohammed, 441 U.S. 380, 397 (1979) (Stewart, J., dissenting)) (emphasis omitted). But Lehr is distinguishable for two reasons. First, Lehr involved a procedural-due-process challenge regarding the adequacy of the notice

6

and the opportunity to be heard when adoption proceedings had been instituted without notice to the father. See Lehr, 463 U.S. at 255. As in all procedural-due-process cases, the Court evaluated the state law at issue by assessing the private interest at issue, the risk of the erroneous deprivation of private liberties, and the government's interest. Compare Lehr, 463 U.S. at 256-65, with Matthews v. Eldridge, 424 U.S. 319, 334-35 (1976) (setting forth the general framework for procedural-due-process cases). In contrast, Meyer and its progeny address the doctrine of substantive due process,[1] which requires a court to identify the

---

[1] I share Justice Clarence Thomas's view that "substantive due process" is an "oxymoron." Dobbs v. Jackson Women's Health Org., 597 U.S. 215, 331 (2022) (Thomas, J., concurring). However, as Justice Thomas has noted, the Privileges or Immunities Clause of the Fourteenth Amendment was clearly meant to protect substantive rights, and parental rights may be among those protected substantive rights. McDonald v. City of Chicago, 561 U.S. 742, 850-51 (2010) (Thomas, J., concurring in part and concurring in the judgment); Troxel v. Granville, 530 U.S. 57, 80 (2000) (Thomas, J., concurring in the judgment); see also Matthew J. Clark, Let the Parents Decide: Alabama Parents' Right to Decide Whether to Mask Their Children or Not in the Age of COVID, 14 Faulkner L. Rev. 43, 57-60 (2022) (exploring originalist theories of whether the Privileges or Immunities Clause protects parental rights). In any case, even though the Supreme Court might have recognized parental rights as being worthy of protection under the wrong clause of the Fourteenth Amendment, it has not overruled that line of precedents. Parental rights certainly are deeply rooted in this Nation's history and traditions. See E.R.G., 73 So. 3d at 650-56 (Parker, J., concurring specially) (discussing the historical roots of parental rights); see also

fundamental right protected by the Fourteenth Amendment and then apply the appropriate standard of review -- usually strict scrutiny when a fundamental right is abridged.

Second, <u>Lehr</u> involved a father who in the two years of the child's life had never supported the child, had never visited the child (except once when she was newly born), and had never made efforts to be involved in the child's life until the adoption process was almost complete. <u>Lehr</u>, 463 U.S. at 249-50, 252. It was a classic case of abandonment, which is a valid ground for finding a child dependent and even for terminating parental rights. See § 12-15-102(8)(5), Ala. Code 1975; 43 C.J.S. <u>Infants</u> § 100 (2014). In contrast, the father in the present case told the mother that he wanted to assume the responsibilities of fatherhood when he found out that the mother was pregnant. He relented only after the mother lied and told him that he was not the father. As

---

Luray Buckner, <u>A Right Defined by a Duty: The Original Understanding of Parental Rights</u>, 37 Notre Dame J. L. Ethics & Pub. Pol'y 493 (2023) (same). Thus, any harm that the Supreme Court has created in invoking the wrong clause of the Fourteenth Amendment is slight. See <u>McDonald</u>, 561 U.S. at 791 (Scalia, J., concurring) (noting his "misgivings about Substantive Due Process as an original matter" but concurring in the majority's holding that it incorporated the protections of the Second Amendment against the states).

soon as he found out that he was the father, he took immediate action to gain custody of his child. This is a stark contrast from <u>Lehr</u>'s deadbeat dad.

Ultimately, my concern with the dissent's approach is that it may substitute the constitutional protections of rights of parents with the best-interest-of-the-child standard. But the Constitution of the United States requires us to give parental rights the stringent protections they deserve. See <u>Troxel</u>, 530 U.S. at 80 (Thomas, J., concurring in the judgment); <u>J.E.</u>, 1 So. 3d at 1008. Unless the Constitution is amended or the governing parental-rights decisions are properly overruled, we are duty-bound to give parental rights the stringent protections that they deserve. We should not attempt to overrule those decisions <u>sub</u> <u>silentio</u> by requiring application of the best-interest-of-the-child standard.

Furthermore, as I have explained before, the best-interest-of-the-child standard can be misused easily. <u>E.R.G.</u>, 73 So. 3d at 656-58 (Parker, J., concurring specially). Many parents are not model parents, but that does not necessarily mean that their parental rights should be abridged because the child could have a better home elsewhere. <u>Santosky v. Kramer</u>, 455 U.S. 745, 753 (1982). The common law would uphold the

9

rights "of a bad parent" as well "as a good one," because, ordinarily, "the law does not hold the tie of nature to be dissolved by any misbehaviour of the parent." 1 Blackstone, Commentaries 442. There are, of course, exceptions, and our Legislature has provided for them. But the standard for finding a child dependent by clear and convincing evidence is different than under the best-interest-of-the-child standard.

Of course, the best-interest-of-the-child standard has a valuable role to play in most custody cases. For instance, when two parents divorce and have coequal fundamental parental rights, the best-interest-of-the-child standard guides the court in determining what to do with their children. E.R.G., 73 So. 3d at 657 (Parker, J., concurring specially). Likewise, if parental rights are properly terminated, I agree that the best-interest-of-the-child standard should guide what happens to the child. Id. But to use the best-interest-of-the-child standard to determine whether a child should be adjudicated dependent puts the cart before the horse. Bodie, 377 So. 3d at 1068-69 (Parker, C.J., concurring in part and concurring in the result); E.R.G., 73 So. 3d at 669 (Murdock, J., concurring specially).

Finally, it should be noted that displacing our parental-rights framework with the best-interest-of-the-child standard opens the door to statism, which is government of men and not of laws. See Bodie, 378 So. 3d at 1064 (Parker, C.J., concurring in part and concurring in the result). What is in the best interest of the child can vary from person to person, depending completely on the subjective views of the judge. See, e.g., Ex parte S.L.J.F., 165 So. 3d 614, 616 (Ala. 2014) (Moore, C.J., dissenting) (arguing that the termination of the rights of a mother who was struggling with depression and financial hardship could not be sustained in light of all the efforts she was making to reunite with the children); Ex parte J.M.P., 144 So. 3d 287, 300, 302-03 (Moore, C.J., dissenting) (arguing that the parents had been drug-free for two years and that the Department of Human Resources had failed to provide clear and convincing evidence of the parents' inability to provide for the children); see also Ex parte S.J., [Ms. SC-2023-0587, Oct. 27, 2023] ___ So. 3d ___, ___ (Ala. 2023) (Parker, C.J., dissenting) (arguing that "copious amounts of hearsay evidence" contributed to the decision to terminate the petitioner's parental rights).

The best interests of the child can also vary from worldview to worldview. For instance, parents in other states have lost custody or control of their children who were struggling with gender-identity issues because they refused to help the children go through "gender-transition" procedures. See, e.g., In re A.C., 198 N.E.3d 1 (Ind. Ct. App. 2022) (affirming a child being taken away from evangelical parents partly because affirming the child's gender identity was found to be in the best interests of the child); In re K.L., 252 Md. App. 148, 258 A.3d 932 (2021) (affirming a trial court's order giving the department of social services authority to consent to child's petition to change name to conform with gender identity over mother's wishes because it was found to be in the best interests of the child). Those decisions are contrary to the God-given and constitutionally protected right of parents to guide their children through any confusion regarding gender identity. But without robust parental-rights safeguards, there is little to stop a judge with a contrary worldview from reading his beliefs into the best-interest-of-the-child standard.

In this case, I believe that the Court of Civil Appeals correctly applied our precedents and found that the juvenile court lacked clear and

convincing evidence demonstrating that the father was unable or unwilling to protect the child. Because I believe that the Court of Civil Appeals correctly gave the father's parental rights the respect they deserve, I concur with quashing the writ.

BRYAN, Justice (dissenting).

I respectfully dissent from the Court's decision to quash the writ of certiorari in this case. We issued the writ to evaluate a potential conflict between the Court of Civil Appeals' decision and this Court's decision in Ex parte R.E.C., 899 So. 2d 272, 279 (Ala. 2004). Ex parte R.E.C. stated, in relevant part:

> "'"Appellate courts do not sit in judgment of disputed evidence that was presented <u>ore tenus</u> before the trial court ...."' <u>Ex parte Roberts</u>, 796 So. 2d 349, 351 (Ala. 2001)(quoting <u>Ex parte Bryowsky</u>, 676 So. 2d 1322, 1324 (Ala. 1996)). 'When the evidence in a case is in conflict, the trier of fact has to resolve the conflicts in the testimony, and it is not within the province of the appellate court to reweigh the testimony and substitute its own judgment for that of the trier of fact.' <u>Delbridge v. Civil Serv. Bd. of Tuscaloosa</u>, 481 So. 2d 911, 913 (Ala. Civ. App. 1985). '[A]n appellate court may not substitute its judgment for that of the trial court. To do so would be to reweigh the evidence, which Alabama law does not allow.' <u>Ex parte Foley</u>, 864 So. 2d 1094, 1099 (Ala. 2003)(citations omitted)."

899 So. 2d at 279.

In the judgments at issue, the Morgan Juvenile Court ("the juvenile court") stated the following regarding A.J.S. ("the child"):

> "In the case at hand[,] <u>the child has no true relationship with the mother or [J.B.,]</u> but[,] more importantly[, J.B.] not only failed to move to protect the child[,] but was actively involved with the mother. … [J.B.] forfeited any real opportunity to

<u>have a steady solid relationship</u> when he failed to exercise protective capacity for the child regarding the mother."

(Emphasis added.)

In spite of the juvenile court's factual finding that J.B., the child's biological father, has "no true relationship" with the child, the Court of Civil Appeals has instructed the juvenile court to enter judgments awarding J.B. custody of the child. In so doing, the Court of Civil Appeals "presume[d] that [J.B.] possesses all the natural instincts needed to properly raise [the] child, which presumption may be overcome only by clear and convincing evidence to the contrary." <u>C.S. v. Morgan Cnty. Dep't of Hum. Res.</u>, [Ms. CL-2022-1246, Jan. 31, 2024] ___ So. 3d ____, ___ (Ala. Civ. App. 2024).[2] Under the circumstances of this case and in light of the juvenile court's evaluation of the evidence presented, I cannot presume so much.

The child at issue here was born out of wedlock. Section 26-10C-1(i), Ala. Code 1975, a portion of the Putative Father Registry Act, provides:

---

[2]The Court of Civil Appeals' opinion addressed 10 consolidated appeals brought by J.B.; C.S., the child's mother; or J.R. and A.R., the child's foster parents. That opinion is cited as <u>C.S. v. Morgan County Department of Human Resources</u>.

"Any person who claims to be the natural father of a child and fails to file his notice of intent to claim paternity pursuant to subsection (a) prior to or within 30 days of the birth of a child born out of wedlock, shall be deemed to have given an irrevocable implied consent in any adoption proceeding."

It is undisputed that J.B. did not comply with the requirements of § 26-10C-1. The Court of Civil Appeals decided that it "need not consider th[is] issue," concluding that it [i]s "a moot point." C.S., ____ So. 3d at ____. I disagree. Because J.B. did not submit notice to the putative-father registry, the Morgan County Department of Human Resources ("DHR"), upon receiving information that the mother was suffering from a mental illness and was abusing controlled substances, instituted a safety plan that did not involve J.B., the juvenile court adjudicated the child dependent, and DHR eventually indicated its intention to seek a termination of the mother's parental rights and adoption by the foster parents. Had J.B. submitted notice to the putative-father registry, he might have become involved in the child's life sooner.

Instead, approximately 20 months after the child's birth, the juvenile court adjudicated J.B. to be the father of the child after genetic testing had established his paternity. Apparently based on that adjudication, the Court of Civil Appeals "presume[d] that [J.B.] possesses

16

all the natural instincts needed to properly raise [the] child ...." C.S., ___ So. 3d at ____.

The Court of Civil Appeals applied this presumption in spite of the juvenile court's finding that J.B. has "no true relationship" with the child. However, "'"[p]arental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring."'" R.K. v. R.J., 843 So. 2d 774, 781 (Ala. Civ. App. 2002)(quoting Lehr v. Robertson, 463 U.S. 248, 260 (1983), quoting in turn Caban v. Mohammed, 441 U.S. 380, 397 (1979)).

> "[T]he United States Supreme Court has been very clear that the constitutional rights of an unwed father depend not on his biological connection to the child, but on the extent that the unwed father has seized his opportunity to develop an actual parenting relationship to the child. Based on those precedents, an unwed father who has not forged an actual parental relationship with his child despite ample opportunity to do so has no fundamental right to parent the child that would be entitled to the due-process and other protections afforded by the United States Constitution."

King v. Tillman-Gilbert, 274 So. 3d 278, 286-87 (Ala. Civ. App. 2018)(Moore, J., dissenting).

> "The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the

17

blessings of the parent-child relationship and make uniquely valuable contributions to the child's development.  If he fails to do so, the Federal Constitution will not automatically compel a state to listen to his opinion of where the child's best interests lie."

Lehr, 463 U.S. at 262 (footnote omitted).

"The bonds of love between parent and child are not dependent upon blood relation and instinct, but may be forged as strongly in the crucible of day to day living.  Out of the actual relationship of parent and child love grows.  It is not merely a product of the biological function of conception and giving birth.  To give paramount consideration to the principle of parental priority or ownership in custody decisions would often be an anathema to the best interest of the child."

Borsdorf v. Mills, 49 Ala. App. 658, 661-62, 275 So. 2d 338, 341 (Civ. App.

1973).  Thus, for example,

"once a court adjudicates the paternity of a child, that adjudication does not automatically bestow upon the newly declared legal father a right to standard visitation with his child.  …  The mode and manner of visitation awarded to an unwed father in a paternity judgment is governed by the best interests of the child.  See C.W.S. v. C.M.P., 99 So. 3d 864, 869 (Ala. Civ. App. 2012)(stating, in an action to determine paternity of child in which juvenile court, among other things, awarded biological father supervised visitation with child, that '[a] determination of a noncustodial parent's visitation with a child is left to the sound discretion of the juvenile court, after a consideration of the best interests of the child, and this court will not reverse an award of visitation unless the record demonstrates that the juvenile court exceeded its discretion in determining the visitation award')."

King, 274 So. 3d at 288 (Moore, J., dissenting).

18

I acknowledge the evidence presented indicating that J.B. did not initially believe that he was the child's father, that he had paid child support, and that he had exercised all allowed visitation, but the juvenile court's judgments acknowledged all of this evidence too, and the juvenile court still determined that J.B. has "no true relationship" with the child. Critically, the Court of Civil Appeals' decision in this case does not mention the juvenile court's finding that J.B. has "no true relationship" with the child, and, therefore, the Court of Civil Appeals did not consider whether that conclusion was reasonable.

However, I believe that the finding provides significant context for the juvenile court's dependency determination as to J.B. In its judgments, the juvenile court also determined that J.B. had "forfeited any real opportunity to have a steady and solid relationship when he failed to exercise protective capacity for the child regarding the mother." The Court of Civil Appeals disagreed, relying instead on what it determined was the "best evidence." C.S., ____ So. 3d at ____.

However, as Presiding Judge Thompson's dissent notes:

"At the April 27, 2022, portion of the trial, [J.B.] denied recalling that Morgan County Department of Human Resources ('DHR') social workers had asked him not to contact the mother, and he represented to the court that, at that time,

19

he had blocked the mother's ability to contact him and was not in contact with her. The evidence at the September 2022 portions of the trial demonstrated that, with knowledge of DHR's disapproval and having experienced the repercussion of having his visitation with the child decreased because of his earlier contact with the mother, [J.B.] was again communicating with the mother and that she had been to his home several times. Additionally, [J.B.] acknowledged that he had maintained contact and communication with the mother even when his own family members had advised him that doing so might endanger his ability to obtain custody of the child.

"… The primary concern about placing the child with [J.B.] was his ability and willingness to protect the child from the mother. The evidence supports the conclusion that [J.B.] was dismissing obvious signs of the mother's mental illness, together with the warnings from others, in an effort to pursue a relationship with the mother. That evidence also supports the juvenile court's determination that [J.B.] was unwilling to take action to demonstrate that he would protect the child. Given the evidence in the record, particularly the nature of the mother's testimony and the questions regarding the father's credibility, I disagree that the father has shown that the juvenile court erred in determining that the child was dependent as to him."

C.S., ___ So. 3d at ___ (Thompson, P.J., dissenting in appeal nos. CL-2022-1248 and CL-2022-1288).

Regarding the Court of Civil Appeals' consideration of ore tenus evidence presented in juvenile cases, this Court has recently reiterated that "the applicable standard of review require[s] the Court of Civil Appeals to base its decision not on its own evaluation of the evidence

presented but, instead, to specifically consider whether the juvenile court could have <u>reasonably</u> reached the conclusion that it did." <u>Ex parte Bodie</u>, 377 So. 3d 1051, 1060 (Ala. 2022).

In this case, the juvenile court's judgments demonstrate that it carefully weighed the evidence presented in reaching its conclusions. After conducting a three-day trial, the juvenile court entered its judgments, stating:

> "The Court has considered all the testimony, the exhibits, pleadings[,] and argument[s] of counsel[,] as well as the applicable law. The Court has considered this from every angle and does not profess to have all the answers for this little girl but makes the best decision for the child that is allowed within the confines of the law."

For the foregoing reasons, I respectfully dissent from the Court's decision to quash the writ of certiorari in this case.

Wise and Stewart, JJ., concur.