*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

KENNETH DWAYNE TAYLOR,

        Plaintiff-Appellee,

UNPUBLISHED
January 18, 2024

v

No. 366736
Ingham Circuit Court
LC No. 22-002534-DP

THURMAN BROWN III,

        Defendant-Appellant.

Before: GARRETT, P.J., and LETICA and MALDONADO, JJ.

PER CURIAM.

Defendant, the legal father of minor child TB, appeals as of right the trial court's order revoking his acknowledgment of paternity under the Revocation of Paternity Act (ROPA), MCL 722.1431 *et seq.*, and its placement of TB with plaintiff. We vacate the order of revocation and TB's placement with plaintiff and remand to the trial court for the dismissal of plaintiff's complaint.

## I. FACTUAL AND PROCEDURAL HISTORY

On September 9, 2022, plaintiff filed a complaint alleging that he was the biological father of TB, a minor child born on October 17, 2019. It was also asserted that TB's conception was not the result of criminal sexual conduct and was filed within three years of TB's birth. The complaint submitted that defendant signed the acknowledgment of parentage of TB on October 17, 2019. Plaintiff sought to have the acknowledgment of parentage revoked, citing a "mistake of fact" and "newly discovered evidence that by due diligence could not have been found before the acknowledgment was signed."[1] Also, on September 9, 2022, plaintiff filed an affidavit under the

---

[1] We note that fraud, duress in signing the acknowledgment, and misrepresentation or misconduct are also possible bases to set aside an acknowledgment of paternity. See MCL 722.1437(4). But, plaintiff did not rely on these grounds to obtain revocation.

"Child Custody Act" (CCA).[2] This affidavit merely alleged that defendant had physical custody of TB in Michigan and that no other pending proceeding could affect the current child custody dispute.

On October 18, 2022, defendant filed an answer to plaintiff's complaint. With the answer, defendant submitted an affidavit, indicating that he was involved in a romantic relationship with TB's birth mother, TCP. Specifically, the couple began dating in March 2017 and lived together.[3] The affidavit also provided that, when TB was born, defendant signed the affidavit of parentage, acknowledging that he was the father of TB. TCP died on November 20, 2020. On February 8, 2021, plaintiff allegedly contacted defendant and asserted that plaintiff was TB's father. Despite this initial contact, defendant's affidavit advised that plaintiff did not file his complaint seeking revocation of paternity until September 2022.

Also on October 18, 2022, defendant moved to dismiss plaintiff's complaint under MCR 2.116(C)(8) and MCR 3.210(C)(8). Defendant alleged that plaintiff's complaint should be dismissed because the accompanying affidavit failed to allege any facts in support of the grounds raised to vacate the acknowledgement of parentage. Because plaintiff did not comply with the affidavit requirements, defendant claimed that plaintiff's complaint was not timely filed, and amendment was impermissible. Defendant further asserted that plaintiff merely alleged that he was the biological father of TB and did not proffer any facts that it would be in TB's best interests to disrupt the child's stable life. Additionally, defendant claimed that the revocation of defendant's acknowledgment of parentage would result in the modification of child custody, and therefore, the provisions of the CCA and the rules governing an established custodial environment applied. Defendant submitted that even if a DNA test was ordered by the court, any test result was not binding on a trial court's determination under ROPA. Defendant filed a notice of hearing date of November 29, 2022. However, on November 2, 2022, the court clerk issued a notice of hearing to the parties that scheduled a hearing date of December 6, 2022, and also ordered both parties to attend the hearing.[4]

On November 30, 2022, plaintiff filed a response to the dismissal motion. He generally opposed defendant's motion to dismiss, asserting that his response and affidavit raised sufficient facts to support the motion. Plaintiff also claimed that the trial court determined that it provided a sufficient affidavit because it ordered genetic testing for TB. Despite these claims of sufficiency, plaintiff nonetheless refiled the same complaint. With the complaint, plaintiff filed a "verified supplement" to the complaint for paternity and affidavit.[5] In the supplemental affidavit, plaintiff

---

[2] The trial court repeatedly advised the parties that it was applying the standards of a ROPA action and not the factors cited in the Child Custody Act, MCL 722.21 *et seq*.

[3] Defendant's answer states that he and TCP were engaged.

[4] The register of actions indicates that the December 6, 2022 hearing was cancelled without further explanation and no rescheduled date.

[5] There is no indication that plaintiff requested leave of the trial court to amend or supplement his complaint, and the amendment was not filed within 14 days of a responsive pleading. See MCR 2.110(A)(1); MCR 2.118(A)(1), (2).

alleged that both plaintiff and defendant were involved in a relationship with TCP at the time minor child TB was conceived. Plaintiff averred that defendant was unaware of plaintiff's romantic relationship with TCP. Because defendant had no contradictory evidence, he signed the affidavit of parentage as the biological father of TB. Plaintiff's affidavit asserted that he was never approached as a possible father of TB "at the time of birth" and that TCP passed away "[s]hortly after [TB's] birth." Plaintiff claimed to "recently" discover photographic evidence of TB that indicated a strong familial resemblance. Curiously, this "supplemental" affidavit reflects that it was subscribed and sworn before a notary public on September 9, 2022, the same date reflected on the initial affidavit. But it was not filed until November 30, 2022. On December 12, 2022, the parties stipulated to effectuate the DNA testing of TB with plaintiff bearing the costs of the test.

On February 27, 2023, defendant moved for sanctions and dismissal of plaintiff's complaint. It was alleged that plaintiff and his counsel were scheduled to appear for a deposition on January 18, 2023, but failed to show. Defendant took the day off work and was present with his counsel waiting for the deposition. Plaintiff's counsel purportedly represented that plaintiff refused to participate in the scheduled deposition until he received the DNA results. Defendant noted that the trial was scheduled to begin on March 15, 2023. Defendant requested that the trial court dismiss plaintiff's complaint with prejudice, determine that it was in TB's best interests that the affidavit of parentage not be revoked, and award reasonable attorney fees, lost wages, and court reporter fees to defendant. There is no indication that plaintiff filed a response to this motion.[6]

At the hearing on the motion for sanctions and for dismissal,[7] defendant argued consistent with his written motion that, when called, plaintiff's counsel indicated that plaintiff refused to pursue his own case. Defense counsel noted that plaintiff had not yet agreed to reschedule the deposition. Defendant requested costs incurred for the failure to appear or $6,000 in costs if dismissal of the complaint was granted. Plaintiff's counsel asserted that he could not confirm the representations made by prior counsel regarding the failure to appear at the deposition. However, plaintiff had acknowledged that he was frustrated at the time of the deposition and should have complied. Plaintiff's counsel further conceded that a financial sanction was "probably in order" but submitted that the sanction of dismissal was extreme and inappropriate. The trial court awarded $175 for the court reporter fee and $500 in attorney fees and denied the motion for dismissal as a sanction.

---

[6] We note that plaintiff's counsel withdrew from his representation on February 7, 2023, and new counsel did not file an appearance until March 7, 2023. On March 14, 2023, the parties stipulated to adjourn the sanctions and dismissal motion and the bench trial to address the revocation of the affidavit of parentage.

[7] At the start of the hearing, the trial court inquired whether the motion to dismiss pertaining to the sufficiency of the affidavit was to be heard. Defendant's substitute counsel was only aware of the motion for sanctions and for dismissal arising from the failure to appear at the deposition. During the hearing, the trial court also advised the parties that the CCA's best interest factors did not apply, only the ROPA's best interest factors.

In May 2023, the bench trial commenced. Plaintiff testified that he met TCP in approximately 2014, and their friendship turned into a romantic relationship. Plaintiff stated that he did not pursue a committed relationship with TCP because of her drug use. Instead, plaintiff became involved with Mercades Delapaz, his current fiancée. But, one year into his relationship with Delapaz, plaintiff began having a sexual affair with TCP, allegedly unbeknownst to Delapaz and defendant. Once a week or every two weeks for several years, plaintiff and TCP would meet in a car or at TCP's home when defendant was at work and engage in unprotected sex. TCP always asked plaintiff for money for gas or food,[8] and he gave it to her.

Plaintiff testified that TCP advised him that she may be pregnant. He initially did not believe she was pregnant premised on his experience with "multiple" other women. Once plaintiff suspected that TCP could be pregnant with his child, Delapaz was also pregnant at the same time. Thereafter, plaintiff gave TCP $400 for an abortion so Delapaz would not learn of his affair. But, plaintiff later concluded that TCP merely took $400 from him because she announced her pregnancy on the social media website Facebook. Plaintiff did not go to the hospital for TB's birth on October 17, 2019. However, he expected to continue, and did in fact, his affair with TCP after she was released from the hospital.

Initially, plaintiff believed there was a 50/50 chance that TB was his child. After three or four months, plaintiff believed there was a 70% chance that TB was his child.[9] Before TCP died in November 2020, she allegedly asked plaintiff to take a DNA test. Although plaintiff knew that a DNA test cost $14 at Rite Aid, he never "got around to that."

Plaintiff estimated that, shortly after TCP died, he contacted TCP's mother about a DNA test in an attempt to "exclude" himself from "the situation," if possible. TCP's mother advised him to speak to defendant. Plaintiff testified that he spoke with defendant on the telephone and exchanged four or five text messages about a DNA test or financial support for TB, but defendant "shot down" his requests. Plaintiff asserted that defendant even represented that defendant was the biological father because of a DNA test, and this information caused plaintiff to "step away." Defendant blocked plaintiff from viewing his Facebook page.

Delapaz had a friendship with TCP before her death. On Father's Day in June 2022, Delapaz went on Facebook to check on the family. Delapaz showed plaintiff a picture of TB, and

---

[8] On the contrary, defendant alleged that plaintiff provided TCP with money or drugs and enabled her addiction and relapses. However, despite plaintiff's testimony regarding TCP's request for and use of the money, the trial court declined defendant's attempt to introduce TCP's statements addressing plaintiff. Curiously, defendant testified that TCP introduced plaintiff to defendant as her friend "Money." Because the exclusion of this evidence was not raised as an issue on appeal, we do not address it.

[9] Plaintiff did not testify that he sought visits with TB as his child. Rather, he apparently saw the child when he visited TCP for their liaisons. Plaintiff noted that TB's head shape mirrored that of plaintiff's infant daughter.

plaintiff knew that TB was his biological child. Plaintiff testified that he immediately consulted and paid an attorney in June 2022, but his prior attorney did not file the suit until September 2022.[10]

Plaintiff testified that he earned $56,000 a year as a machine operator and also owned a cleaning service. After initially testifying to working 10-hour days and having dinner with his children late at night, plaintiff denied that he was "spread thin." He then claimed that he did not always work the second job. Plaintiff had eight biological children with four different women. Although plaintiff was not subject to child support orders, he testified that he financially provided for his children. Plaintiff currently resided in a two-bedroom, one bathroom home with Delapaz, and five children. Initially, the couple occupied one bedroom with their son, and the remaining children shared the other bedroom. But, after plaintiff hired a lawyer, the couple began to sleep in the living room. Plaintiff testified that he was in the process of purchasing the home that the family occupied, and it was their intent to build an addition on the home. TB would reside in a bedroom with plaintiff's son. Plaintiff opined that TB's first few days with his new family might be "tough," but it would not be a difficult transition. If the affidavit of parentage was revoked, plaintiff was willing to let defendant see TB.

Delapaz testified that she met TCP through plaintiff, and they were friends. But, Delapaz was unaware that plaintiff and TCP dated, or that the couple continued to have intimate relations. In June 2022, Delapaz observed photographs of TB on Facebook and showed them to plaintiff. Plaintiff admitted that there was a "possibility" that TB was his child. Despite the affair, Delapaz opted to continue her relationship with plaintiff, believing that he could change and was a good father. She testified that plaintiff attended their children's games and practices, even driving the children when she could not. However, Delapaz admitted that plaintiff did not have a driver's license. Delapaz denied delaying any claim to TB, asserting that the couple sought out a lawyer the day after seeing the Facebook photographs. Delapaz testified[11] that plaintiff "let" her work part-time, and while she worked, their children were cared for by her parents who lived across the street.

Defendant testified that he worked at a medical implant company for nine years. Defendant met TCP in 2015, but their relationship ended. In 2017, when TCP was addressing substance abuse issues, defendant drove her to a methadone clinic for treatment. The couple began living together in 2017. After TCP learned of her pregnancy in 2019, the couple planned for their baby and future together. Defendant purchased a larger, safer vehicle, and they began searching for a home. Their families came to the hospital for TB's birth, and defendant signed the

_____

[10] Plaintiff testified that his failure to have a relationship with TB was caused by defendant, "I was took out of his life for somebody to not like me for whatever reason." Again, although plaintiff opined that there was no reason for defendant's animosity, the trial court did not allow defendant to testify regarding TCP's drug use and defendant's alleged role as her enabler. Additionally, plaintiff testified that TB would want to be with plaintiff as his biological father instead of "someone who wanted to be a father."

[11] Delapaz testified that she selected her rental home for herself and her children because her parents lived across the street. Within a short time of meeting plaintiff, he moved into her home. She agreed that the couple planned to purchase the home and build an addition.

acknowledgement of parentage, having no idea anyone else could be the father. TB was hospitalized for a month after his birth. When defendant was not working, he spent all his time at the hospital until TB was released. Since TB's discharge from the hospital, TB had a speech impairment, but defendant enrolled the child in speech therapy to address his issues.

Defendant testified that he and TB moved into their family home a few weeks after TCP died. TB had his own room with a Paw Patrol and Spiderman theme. Defendant ensured that there were photographs and mementos of TCP in the room. Defendant testified that he was currently engaged to Sara Russell, a schoolteacher. He slowly introduced Russell to TB who was apprehensive about strangers. Russell took TB to daycare in the morning, and defendant picked him up. When the family arrived home in the afternoon, they engaged in outdoor activities, read books, and made dinner. In addition to Russell, defendant had extensive family support that assisted him after TCP died and attended the court hearings.

Defendant was advised of plaintiff's claim by TCP's mother in February 2021. Plaintiff called defendant claiming that TB was his son and made various threats. After calming down, plaintiff claimed that he gave TCP $700 to have an abortion. Because TB looked like plaintiff's other children, plaintiff wanted a DNA test. Defendant advised that TCP had just died, and he needed to think. Defendant consulted with an attorney, and she advised him to not take any action until plaintiff did so. Accordingly, defendant refused to meet plaintiff at Rite Aid for a DNA test. Plaintiff purportedly told defendant to "have a heart." Defendant responded that he did everything for TCP and to help her maintain sobriety,[12] yet plaintiff acted "behind his back." Plaintiff did not respond to this communication.[13] Defendant testified that he was unwilling to allow TB to have a relationship with plaintiff because of his knowledge of plaintiff's past behavior, a matter which the trial court would not allow him to provide testimony.

The DNA results determined that plaintiff was TB's biological father. At the conclusion of the testimony, the trial court admonished the parties that this case presented a "horrible situation" that "should have been rectified at birth." It further advised the parties to put the wellbeing of TB first regardless of any court order. The trial court concluded that the action was timely filed within three years and that the affidavit was sufficient. The trial court stated that there was a "mistake of fact and newly discovered evidence." The trial court determined that there would be harm to TB regardless of whether he remained with defendant or began to live with plaintiff. However, because plaintiff was willing to allow defendant to have a relationship with TB, the trial court weighed this factor in favor of plaintiff. The trial court acknowledged that both homes were safe, and the size of the home did not determine the amount of love and guidance. The trial court also faulted defendant for advising plaintiff that he had taken a DNA test and that

---

[12] Plaintiff testified that he gave TCP money as she requested. Defendant testified that to prevent TCP from relapsing, he no longer carried cash and had changed his credit card numbers.

[13] The parties disputed whether defendant represented that he took a DNA test. Yet, the parties did not admit their text message exchanges. Lastly, defendant's mother, a licensed therapist, testified regarding her care of TB, the child's speech issues, and the child's interactions with strangers.

this "deception" placed TB "in harms' way," could have minimized the harm, and could have "avoided the whole situation that we are in today." It concluded that defendant had no right to deny plaintiff of his liberty interest in his child, and that liberty interest, to raise a biological son, was the "overwhelming factor." The trial court determined that it was in TB's best interest to know his biological family. The trial court then concluded that it had no authority over the manner or nature of TB's exchange,[14] but encouraged the parties to do so in a "healthy way with the help of a counselor."[15] This appeal followed.

## II. STANDARDS OF REVIEW

This case involves application of ROPA. "This Court reviews a trial court's factual findings in proceedings under [ROPA] for clear error. The trial court has committed clear error when this Court is definitely and firmly convinced that it made a mistake." *Jones v Jones*, 320 Mich App 248, 253; 905 NW2d 475 (2017) (quotation marks and citation omitted). When reviewing factual findings, we defer to the trial court concerning issues of credibility. *Berger v Berger*, 277 Mich App 700, 705; 747 NW2d 336 (2008).

"The proper interpretation and application of a statute is a question of law, which this Court reviews de novo." *Rogers v Wcisel*, 312 Mich App 79, 86; 877 NW2d 169 (2015). Additionally, the interpretation of a statute as applied to the facts present questions of law subject to de novo review. *Bronson Health Care Group, Inc v Titan Ins Co*, 314 Mich App 577, 582; 887 NW2d 205 (2016). A trial court commits clear legal error when "the trial court errs in its choice, interpretation, or application of existing law." *Cheesman v Williams*, 311 Mich App 147, 150-151; 874 NW2d 385 (2015) (quotation marks and citation omitted).

> When interpreting a statute, a court must give effect to the Legislature's intent. To determine the legislative intent, this Court first looks to the language of the statute itself, and if the language is unambiguous, it must be enforced as written. Words of statutes are given their plain and ordinary meanings, while legal terms are construed according to their legal meanings. Statutes must be read as a whole, and this Court may not read statutory provisions in isolation. [*Jones*, 320 Mich App at 253 (quotation marks, citations, and alteration omitted).]

---

[14] The trial court determined that it had no authority over the exchange. MCL 722.1443(6) expressly provides that "the court may appoint a guardian ad litem to represent the child's interests with respect to the action or motion." In light of TB's age, his potential removal from the only home and parent he had ever known, and his speech impediment, this appointment would have provided an investigation into the parties' homes, parenting ability and fitness, as well as a procedure to conduct a transfer that would minimize certain harm.

[15] The trial court ordered that the exchange would occur in six months. At oral argument in this appeal, defense counsel advised that the only available updated information was that the exchange occurred on December 18, 2023.

III. ROPA

Defendant first alleges the trial court committed clear legal error when it determined that the affidavit sufficiently delineated (1) a mistake of fact, and (2) newly discovered evidence that by due diligence could not have been found before the acknowledgment was signed. We agree.

A. OVERVIEW OF ROPA

ROPA "provides the procedures for courts to determine the paternity of children in certain situations." *Jones*, 320 Mich App at 253. To that end, ROPA provides methods for revoking paternity, and "the proofs and circumstances necessary to revoke paternity differ depending on the classification of paternity at issue, and, in some respects, depending on the individual seeking the revocation of paternity." *Glaubius v Glaubius*, 306 Mich App 157, 165; 855 NW2d 221 (2014). In this case, it is undisputed that defendant is an "acknowledged father" because he "has affirmatively held himself out to be the child's father by executing an acknowledgment of parentage" and that plaintiff was an "alleged father" because he is "a man who by his actions could have fathered the child." MCL 722.1433(a), (c). "After identifying the classifications of fathers, the Revocation of Paternity Act details the methods applicable to the revocation of each specific type of paternity." *Glaubius*, 306 Mich App at 165.

Section 7 of ROPA outlines the procedure for revocation of an acknowledgment of paternity and provides, in relevant part:

> (1) The . . . alleged father . . . may file an action for revocation of an acknowledgment of parentage. An action under this section shall be filed within 3 years after the child's birth or within 1 year after the date that the acknowledgment of parentage was signed, whichever is later. . . .
>
> * * *
>
> (4) An action for revocation under this section shall be supported by an affidavit signed by the person filing the action that states facts that constitute 1 of the following:
>
> (a) Mistake of fact.
>
> (b) Newly discovered evidence that by due diligence could not have been found before the acknowledgment was signed.
>
> * * *
>
> (5) If the court in an action for revocation under this section finds that an affidavit under subsection (4) is sufficient, the court shall order blood or tissue typing or DNA identification profiling . . . . [MCL 722.1437.]

"The results of blood or tissue typing or DNA identification profiling are not binding on a court in making a determination under this act." MCL 722.1443(5).

When an affidavit fails to meet the requirements of MCL 722.1447(4), the court errs in addressing the application of the best interest factors, MCL 722.1443(4). *In re Moiles*, 495 Mich 944; 843 NW2d 220 (2014).[16] The use of the term "shall" in MCL 722.1447(4) denotes mandatory and imperative direction. See *Stand Up For Democracy v Secretary of State*, 492 Mich 588, 601; 822 NW2d 159 (2012). Thus, plaintiff was required to submit an affidavit that contained facts demonstrating a mistake of fact and newly discovered evidence. However, a review of plaintiff's affidavit filed September 9, 2022 revealed that it contained no information addressing a mistake of fact or newly discovery evidence addressing the father of TB. It merely identified TB's current address, defendant as his custodian, and that plaintiff had not participated in any custody action pertaining to the child. Because plaintiff's affidavit did not comply with MCL 722.1447(4), the trial court erred in addressing the best interest factors and ultimately revoking defendant's affidavit acknowledging parentage.

We acknowledge that defendant challenged the sufficiency of plaintiff's affidavit and requested dismissal of plaintiff's complaint. In response, plaintiff asserted that his affidavit was sufficient. Nonetheless, without leave of the trial court, plaintiff refiled the complaint with a supplemental affidavit on November 30, 2022.[17] This supplemental affidavit was filed more than three years after the child's birth, rendering plaintiff's action for revocation of an acknowledgment of parentage as untimely. MCL 722.1437(1). Because a revocation action "shall be filed within 3 years after the child's birth," there is no basis for an alleged parent to file an action for the revocation of paternity after this time period expired. *Kalin v Fleming*, 322 Mich App 97, 101-102; 910 NW2d 707 (2017).

Nonetheless, even if we assume without deciding that the supplemental affidavit related back to the filing of the original complaint and affidavit, the supplemental affidavit did not satisfy MCL 722.1437(4)(a) or (b). Plaintiff had the burden of establishing a mistake of fact, and a mistake of fact arises from "a belief that a certain fact exists when in truth and in fact it does not exist." *Rogers*, 312 Mich App at 96 (quotation marks and citation omitted). The supplemental affidavit contains no information regarding a mistake of fact by plaintiff. Rather, it merely asserts that plaintiff was involved in a romantic relationship with TCP. Therefore, plaintiff failed to demonstrate a mistake of fact.[18]

---

[16] Michigan Supreme Court orders constitute binding precedent when the rationale can be understood. *Woodring v Phoenix*, 325 Mich App 108, 115; 923 NW2d 607 (2018). The *Moiles* Court cited to the affidavit factors contained in MCL 722.1447(2). MCL 722.1447 was amended by 2014 PA 368, and the affidavit requirements are now located in MCL 722.1447(4).

[17] Although the complaint and supplemental filing do not contain a time-stamp, the register of actions indicates that plaintiff's response was filed on November 30, 2022.

[18] Instead, plaintiff alleged a mistake of fact on the part of defendant. Plaintiff's supplemental affidavit states that defendant was unaware of plaintiff's role as a romantic partner to TCP and was without evidence to contradict his status as the biological father, causing defendant to sign the affidavit of parentage. However, MCR 2.119(B)(1) addresses the form of an affidavit that must be based on personal knowledge, state with particularity facts admissible as evidence, and

-9-

Additionally, plaintiff failed to delineate "[n]ewly discovered evidence that by due diligence could not have been found before the acknowledgment was signed." MCL 722.1437(4)(b). Plaintiff's supplemental affidavit stated that, "After careful consideration of the date of conception, his romantic involvement with the mother, and the recently discovered photographic evidence, Plaintiff is reasonably certain that he is the biological father of this child." This affidavit is devoid of facts that demonstrate TCP's pregnancy was not apparent to him. Plaintiff failed to allege that he did not see TCP after the date of conception and while her pregnancy progressed. Because plaintiff failed to address the due diligence requirement, this supplemental affidavit also failed. Accordingly, because the affidavit was insufficient,[19] the trial court legally erred in failing to grant defendant's motion to dismiss the complaint.[20]

We vacate the trial court order revoking defendant's acknowledgment of parentage and placement of TB with plaintiff. This opinion shall have immediate effect pursuant to

---

demonstrate that the affiant, if sworn as a witness, could competently testify to the facts stated in the affidavit. Plaintiff's supplemental affidavit failed to delineate that he had personal knowledge and could competently testify regarding defendant's mistake of fact. Because plaintiff's supplemental affidavit did not satisfy the requirements of MCR 2.119(B)(1) and did not demonstrate a mistake of fact on plaintiff's part, his challenge on this ground was insufficient.

[19] We disagree with plaintiff's assertion that defendant's challenge to the sufficiency of the affidavit was waived by an agreement to submit to DNA testing. MCL 722.1437(5) states that "[i]f the court in an action for revocation" finds that an affidavit as required by MCL 722.1437(4) is sufficient, the court shall order DNA identification profiling. Defendant specifically challenged the sufficiency of the affidavit by motion and scheduled the hearing for November 29, 2022. According to the register of actions, the trial court rescheduled the motion and then cancelled it. However, when the parties appeared for the motion for sanctions, the trial court acknowledged that the motion was still pending and ruled on the motion before addressing the best interest factors. The stipulation to a DNA test did not obviate or waive defendant's challenge to the sufficiency of the affidavit.

[20] Because plaintiff's affidavits were insufficient, *Moiles*, 495 Mich at 944, the trial court erred in examining TB's best interests. For purposes of completeness, we note that the trial court faulted defendant for his "deception" and stated that paternity could have been resolved earlier because plaintiff contacted defendant when TB was a year old. This conclusion ignores plaintiff's testimony that TCP advised him of her pregnancy. Plaintiff's response was to give TCP $400 for an abortion because he wanted to prevent Delapaz from learning of his affair with TCP. Plaintiff continued his affair with TCP and saw her announce her pregnancy on social media. Once TB was born, plaintiff saw TB when he continued to meet TCP for liaisons. At the bench trial, plaintiff admitted that there was a 50/50 chance that he was TB's father during the pregnancy and a 70% chance after he saw TB in person. Plaintiff had a much earlier opportunity than defendant to address his paternity, but chose not to do so because of his relationship with Delapaz. And, the trial court clearly erred in granting "overwhelming" weight to the biological relationship between plaintiff and TB. See *Lehr v Robertson*, 463 US 248, 260-261; 103 S Ct 2985; 77 L Ed 2d 614 (1983) (constitutionally protected parental rights do not arise simply because of a biological connection between a parent and a child, but require more enduring relationships.).

-10-

MCR 7.215(F)(2), and TB shall immediately be returned to defendant's care. This case is remanded to the trial court for the limited purpose of dismissing this ROPA action with prejudice. Defendant, being the prevailing party, may tax costs. MCR 7.219. We do not retain jurisdiction.

/s/ Kristina Robinson Garrett
/s/ Anica Letica
/s/ Allie Greenleaf Maldonado